**STATE of Tennessee**

v.

**Rudolph MUNN.**

Supreme Court of Tennessee,
at Nashville.

Aug. 31, 2001.

Rehearing Denied Sept. 28, 2001.

J. Stanley Rogers and Christina Henley Duncan, Manchester, TN, for the appellant, Rudolph Munn.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Marvin S. Blair, Assistant Attorney General; Kim R. Helper, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

ANDERSON, C.J., delivered the opinion of the court, in which DROWOTA, BIRCH, HOLDER, and BARKER, JJ., joined.

We granted this appeal to determine the following issues: (1) whether the secret police videotaping of the defendant's conversations, while alone with his parents in a police interview room, violated the defendant's rights under the Fourth Amendment to the United States Constitution, article I, § 7 of the Tennessee Constitution, and the federal and state wiretapping statutes; (2) whether the defendant's Miranda rights were violated; (3) whether later confessions made by the defendant should have been suppressed under the "derivative evidence rule"; and (4) whether the trial court erred in the sentencing phase by refusing to charge the no-adverse-inference instruction.

A majority of the Court of Criminal Appeals panel affirmed the defendant's conviction for first-degree murder and sentence of life without parole, concluding (1) that the defendant's Fourth Amendment rights were not violated because the defendant did not have a reasonable expectation of privacy; (2) that the defendant was not in custody when he was interviewed by the officers and therefore a Miranda warning was not required; (3) that the issue regarding the derivative evidence rule was moot; and (4) that the trial court did not err by refusing to charge the no-adverse-inference instruction in the sentencing phase.

After a thorough review of the record and relevant authority, we hold that the defendant had a reasonable expectation of privacy and that his rights under the Fourth Amendment to the United States Constitution, article I, § 7 of the Tennessee Constitution, and federal and state wiretapping statutes were violated by the secret taping of his conversations in the police interview room. We also conclude that the defendant was not entitled to Miranda warnings because he was not in custody when interviewed and that his confession was not subject to suppression under the derivative evidence rule. Finally, we conclude that the defendant was entitled to have the no-adverse-inference instruction given to the jury during the sentencing phase of the trial. Accordingly, we affirm in part, reverse in part, and remand to the trial court for a new sentencing hearing in accordance with this opinion.

## BACKGROUND

The defendant, Rudolph Munn, was arrested and charged with the first-degree murder of his Middle Tennessee State University ("MTSU") roommate. The facts leading up to his arrest are as follows.

On November 28, 1995, the Murfreesboro Police Department received a call that the body of a white male had been found in the Days Inn parking lot on South Church Street in Murfreesboro, Tennes-

see. Upon arrival, officers discovered that the victim had sustained a wound to the head and had no identification on his person. The autopsy report revealed that the death was the result of a contact gunshot wound to the head with the bullet traversing the brain. On November 30, 1995, someone called the police station and identified the victim as Andrew Poklemba, a student at MTSU.

In an attempt to verify this information, Officers Eddie Peel and Chris Guthrie, both of the Murfreesboro Police Department, along with several other officers, went to Poklemba's dormitory room at MTSU on November 30, 1995. Shortly thereafter, the defendant returned to the room. The defendant told the officers that he had not seen Poklemba since about 3:45 p.m. on Monday, November 27, 1995. Officer Peel asked the defendant if he had any pictures of Poklemba. After looking at two pictures, the officers identified the victim as Andrew Poklemba. Before leaving the dormitory room, the officers briefly interviewed the defendant.

The next day, December 1, 1995, after having conducted interviews with other people who knew Poklemba, Officers Peel and Guthrie noted several discrepancies in the defendant's story. The officers also believed that the defendant had more information about Poklemba than he had told them the previous day. That afternoon, Officer Peel called the Munn residence in Manchester, Tennessee and requested that the defendant come to the police station in Murfreesboro.

At approximately 5:00 p.m. on the same day, December 1, 1995, the defendant, accompanied by his parents and his two-year-old sister, arrived at the police station. Officers Peel and Guthrie escorted the defendant and his father to a third floor police station interview room. Over the door was a sign entitled "Felony Book-ing Room." The room was equipped with blinds on the windows, a small table, chairs, and an audio tape recorder on the table. Unknown to the defendant or his father, the room was also permanently equipped with a video camera which was hidden in a clock on the wall. In addition, there were hidden microphones located in the ceiling above the tables and chairs. Video cassette recorders were located in a separate private room from which conversations in the interview room could be monitored and recorded. The officers did not inform the defendant or his father that their conversations were to be monitored and recorded by a hidden video camera and microphones.

After the defendant was taken to the interview room, Officer Guthrie explained that he was turning on the tape recorder which was located on the table. He also stated that no one was under arrest and that the defendant could leave at any time. The defendant indicated that he understood this statement. Both Officers Peel and Guthrie inquired about the discrepancies in the defendant's story, but the defendant generally stayed with his original story. At no time did the defendant state that he wanted to leave or that he wanted an attorney. At the conclusion of the 54 minute interview, Officer Peel said that the defendant and his father were free to go and escorted them to the police station lobby where the defendant's mother and little sister were waiting.

After the return to the lobby, Officer Peel asked Mr. Munn to explain to Mrs. Munn that the defendant might be asked to return to the station if more information was needed. Mrs. Munn became very upset and asked Officer Peel if he thought that the defendant had killed Poklemba. Officer Peel told Mrs. Munn to ask the defendant. Mrs. Munn did so, and the defendant did not respond. Officer Peel

stated that he would like to talk to the defendant alone. Mrs. Munn later testified that Officer Peel kept staring at her as if he wanted her to "get involved in the process" and that she felt that they were no longer free to leave at that time. Mrs. Munn then asked the defendant if he wanted to talk with the police further, and the defendant replied that he did. They all then proceeded to the third floor. Officer Peel, Officer Guthrie, and the defendant went into the interview room while Mr. Munn, Mrs. Munn, and the defendant's little sister waited outside in the hallway.

Once in the interview room, Officer Peel turned on the audio tape recorder which was still located on the table and told the defendant that he was not under arrest; that he had voluntarily come to the station; and that he could leave at any time he wished. The defendant said that he understood. Officer Guthrie told the defendant that "[i]t's time to tell it [the truth]." Officer Peel then said, "You know who killed him, don't you?" After a few minutes, Officer Peel asked the defendant to provide a copy of his fingerprints. The defendant replied, "Could I come . . . do it next week when my parents aren't here? I'll call you and I can come down here." The officers then told the defendant that they had a witness who would say that he saw the defendant and the victim arguing the day before the victim was killed. At one point during the interview, the defendant's contact popped out. The defendant asked the officers if a mirror was available. Although a bathroom was located just outside the interview room, the officer told the defendant to pull the blind up on the window and use its reflection for a mirror.

At least three more times during the interview, the officers told the defendant that they knew he was not telling the truth, and they urged him to tell all that he knew. The defendant again said that he would rather come back on Monday and be fingerprinted. The officers told the defendant, "Now's the time to do it [tell the truth], with momma and daddy here to support you and be with you." Officer Peel then told the defendant:

I'm gonna tell you your momma's gonna ask me if I think you did it. And I'm gonna say momma yes I do. And you know what she's gonna do. She's gonna have a fit.

Again, the defendant stated that he would rather come back and talk to the officers later.

At this point, Mrs. Munn opened the door and came into the booking room. Mrs. Munn said that she had been listening outside the door and had heard what they were saying. She told the officers, "This sounds like the kind of thing ____ need ____ lawyer ____." (The blanks represent portions of the transcripts and tapes that are inaudible.) Mrs. Munn asked the officers, "You're not intimidating him to tell you something?" The defendant then responded, "They're not. They're being nice." While the officers were still present in the room, Mrs. Munn began to plead with the defendant to tell the officers what happened. The defendant then replied, "I told them what happened momma." Next, Officer Guthrie stated that he and Officer Peel thought that the defendant had killed the victim. Then, Officer Peel stated:

I think that for whatever reason it was, he and Andrew. Went to this motel. Andrew was shot. Andrew's car was brought back and parked next to where your daughter's dorm is and left there. And whoever did it, walked on off. And the discrepancies in his story, that he's told, makes us believe that he was the one that done it.

Officer Peel then informed Mrs. Munn that her son had asked to come back on Mon-

day to speak further with them. During these conversations, the defendant never specifically asked to leave the room or to talk to a lawyer. Throughout the interview there had been the distant sound of people outside the door, as evidenced in the video tapes.

Officer Peel then asked Mrs. Munn, "Do you want to talk to us or do you want to talk to him by himself?" Officer Peel asked the defendant, "Do you want to talk to your momma? Or do you want to talk to us?" Officer Guthrie added, "Do you want to talk to your momma by yourself?" The defendant responded, "Yeah." Both officers left the room. The door to the interview room was then closed, but not locked. Officer Peel went into the hall area and Officer Guthrie went in and out of the separate video monitoring room.

As Mrs. Munn sat close to the defendant and patted him on his knee, she pleaded with him to tell the officers what they wanted to know. The defendant said, "I shot him." The defendant proceeded to tell his mother that he shot the victim "for the money." He said, "I told him I was gonna pay him late. I borrowed his gun and sold it, and I shot him. Didn't have any intention of paying the money." The defendant also admitted:

> Well, we had to go somewhere else. I told him we were going to go ___ and meet somebody but he ___ the license plates on the car, so if we did get caught it would be hard to find when we did that, when he knelt down to unscrew the license plate. Then I shot him in the back of his head. He fell down and I rolled him over and took his license and wallet.

> . . .

> I didn't like the kid from the very beginning. I hated him with a passion and ___ was the first time. I couldn't stand

the kid. He used to pick on me because I wasn't as smart as he was. I hated him. I couldn't stand him. He disgusted me. He had pornographic magazines in the room, it was disgusting.

Mrs. Munn testified that she thought she and the defendant were alone in the interview room and that no one was listening or recording their conversations. After the disclosure, the defendant asked Mrs. Munn to "[g]o find the police so I can tell them." Mrs. Munn complied.

Once Mrs. Munn found the officers, she asked them to accompany her to the interview room where she expressed her confusion about what she should do. She then stated, "He says he shot [the victim]." The defendant interjected, ".22 caliber, is that what you found?" Officer Peel asked if the defendant wanted to tell them about it. The defendant said, "Don't turn on the tape, I would rather not tape it." Following this exchange, Mrs. Munn asked, "Don't we have to have a lawyer?" Officer Peel stated, "If you want one, it's up to you, just whatever you want to do." The defendant did not ask for an attorney nor did he ask to leave the room. Mrs. Munn expressed a desire to talk with her husband and later asked to speak with Officer Peel alone. Mrs. Munn and Officer Peel left the room leaving Officer Guthrie and the defendant alone.

Later, the defendant's father and his two-year-old sister entered the interview room. In the presence of Officer Guthrie, the defendant's father asked the defendant whether he shot the victim. The defendant said, "Yes." Then, the defendant's father asked, "Why'd you do it?" The defendant replied, "For money.... For money. I hate it that I had to ask you for money, never enough.... Plus, I hated the kid...." After the exchange, Officer Guthrie left the interview room, leaving the defendant, his father, and his sister

alone in the room. The defendant and his father continued to discuss the facts which motivated his actions. Specifically, the defendant told his father that he killed the victim for a total of $800 to $900.

Later, Mrs. Munn re-entered the room. (There were no officers present in the interview room at this time.) Then, Mr. Munn asked his wife, "He did it?" Mrs. Munn said, "That's what he said." A few minutes later, Mrs. Munn asked her husband, "Was it an accident?" The defendant responded:

It was intentional, I did it on purpose. I knew exactly what I was gonna to do. I knew what to take to take his identification. I wish I could have put his car somewhere else but Abernathy was the farthest away from Sharp that there was, that I could think of, without having to walk too far. That's why I put it over there.

Mrs. Munn then asked, "Now what do we do? How come you are not crying? How come you don't feel awful about what you did?" The defendant replied, "Because I am a psychopath, in my opinion." He continued, "I know what I did. I know it was wrong. There is nothing I can do to change that. ___ cry is not going to change it. I have to accept responsibility, I'm not gonna sit and cry."

Following this exchange, Officer Peel reentered the room. The officer spoke briefly with Mrs. Munn and the defendant. Mrs. Munn then told Officer Peel that "[h]e [the defendant] should have a lawyer." Officer Peel stated, "If he wanted one." Then, he quickly changed the subject and left the room.

Later, Officer Peel and Officer Guthrie returned to the interview room. At one point, Officer Peel asked the defendant, "Feel better?" The defendant responded, "Yeah." The officers spoke to the defendant about being an adult and having to make up his own mind. The defendant then asked Officer Peel what would happen to him. Officer Peel told the defendant that the District Attorney was on the way and that he said "yea or nay." The defendant then asked, "What do you mean 'yea or nay'?" Officer Peel responded, "On what to do. We are not trying to rush you. He says whether to charge you tonight or what to do or let you go home tonight and charge you later or what." The defendant told the officers, "[I]t was all about the gun and money, it's always been about money." At this point, Officer Peel pushed a copy of the *Miranda* warnings in front of the defendant and asked, "Have you read that?" The defendant then looked at the written *Miranda* warning and told them, "No." Officer Peel then stated, "Why don't you go ahead and read that just to be safe?" The defendant looked at the warning for approximately 15–25 seconds. Officer Peel then stated, "Know what you want to do yet?" The defendant stated, "I'm going to wait and see what happens ___ I don't want to sign anything." Officer Guthrie then said, "You understand it?" The defendant responded, "Yeah."

At one point, Officer Peel said, "Reckon we can find the billfold." The defendant replied, "I can help you find it, the keys too." The defendant then initiated several topics of discussion relating to the crime. These discussions were not in response to police questioning, but appeared simply to be an attempt by the defendant to determine how much the police actually knew. Later, the defendant's father entered the interview room and asked, "Where's he going from here?" Officer Peel replied, "Well we ain't started. We'll have to wait and see, what y'all said, momma told us to wait until she comes back." Then, the defendant said, "[G]et a lawyer, that would probably be the best thing, ___ get law-

yer. Y'all said I wasn't under arrest so I could leave tonight and I could just...." Officer Peel responded, "You're going to be arrested tonight."

There was then a discussion about waiting for a lawyer, and the Munns were told that the District Attorney was on the way. The whole Munn family and both officers were present in the room at this time. Mrs. Munn asked her son, "Rudy, are you sorry?" The defendant responded, "Not really. He was a dirty little son-of-a-bitch, looked at porno magazines." Moments later, the Munns were told that the District Attorney was there and they were asked if they wished to talk with him. The defendant was subsequently arrested and booked that evening. The defendant was interviewed for a total of 3 ½ to 4 hours before being arrested.

Before trial, the defendant moved to suppress the secretly-videotaped statements upon the grounds that he had a reasonable expectation of privacy in the statements made. At the suppression hearing, the trial court denied the defendant's motion to suppress the secretly-videotaped statements, finding that there was no custodial interrogation and that the defendant did not have a reasonable expectation of privacy in the statements. At trial, the defendant was convicted of first-degree murder and sentenced to life without parole.

On appeal, the Court of Criminal Appeals panel, in a 2–1 decision, upheld the defendant's conviction and sentence. The intermediate court majority found that the secret taping of the defendant's conversation with his parents while alone in the interview room was not a violation of the defendant's Fourth Amendment rights because the defendant did not have a reasonable expectation of privacy in the statements made. The panel also found that the evidence in the record does not pre-ponderate against the lower court's finding that the defendant was not in custody when he was interviewed by the officers. Finally, the intermediate court found that the "derivative evidence rule" issue was moot since they had held that there were no constitutional violations and that the trial court did not err by failing to give the no-adverse-inference instruction as requested by the defendant.

Judge Joseph M. Tipton concurred in affirming the conviction, but dissented on the basis that the secret taping of the conversations between the defendant and his parents violated the Fourth Amendment to the United States Constitution and the federal and state wiretapping statutes and that the error affected the defendant's sentence.

For the reasons stated herein, we reverse the judgment of the Court of Criminal Appeals in part and remand to the trial court for a new sentencing hearing in accordance with this opinion.

## SUPPRESSION OF THE DEFENDANT'S VIDEOTAPED STATEMENTS

### Standard of Review

■ When evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, an appellate court must uphold the trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise. *State v. Odom,* 928 S.W.2d 18, 23 (Tenn.1996). Issues of credibility of witnesses, the weight and value of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial judge. *Id.* The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." *Id.; see also State v. Binette,* 33 S.W.3d 215, 217 (Tenn.2000).

■ However, "when a trial court's findings of fact on a motion to suppress are based solely on evidence that does not involve issues of credibility, appellate courts are just as capable to review the evidence and draw their own conclusions." *Binette*, 33 S.W.3d at 217. In such an instance, the standard of review is de novo without a presumption of correctness. *See id.*

### Constitutional Standards

The defendant argues that certain of his videotaped statements should have been suppressed because they were taped in violation of his rights under both the United States Constitution and the Tennessee Constitution.

■ The Fourth Amendment to the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated. No warrant shall issue but upon probable cause supported by oath or affirmation and particularly describing the place to be searched and the person or things to be seized.

Similarly, article I, § 7 of the Tennessee Constitution provides:

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

The purpose of the Fourth Amendment and article I, § 7 is to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." *State v. Bridges*, 963 S.W.2d 487, 490 (Tenn.1997) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)); *see also State v. Downey*, 945 S.W.2d 102, 106 (Tenn.1997). Therefore, under both the United States Constitution and the Tennessee Constitution, "a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression...." *State v. Bridges*, 963 S.W.2d at 490.

■ The interception of a conversation in which a person has a reasonable expectation of privacy constitutes a search within the meaning of the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The United States Supreme Court has stated that each Fourth Amendment inquiry involves determining (1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (citations omitted). We have applied the same analysis under article I, § 7 of the Tennessee Constitution. *See State v. Ross*, 49 S.W.3d 833, 840 (Tenn.2001).

■ Accordingly, in this case we must first determine whether the defendant had a subjective expectation of privacy in his conversations while alone with his parents in the police station interview room.

We begin our analysis by noting that the defendant appeared voluntarily to be questioned and was told he was free to leave at any time. He was not in custody, had not been given a *Miranda* warning, and was not under arrest. After being questioned and prior to talking with his parents alone,

the defendant requested that the audio tape recorder, which was located on the table in the interview room, be turned off; and the officers complied. Officer Peel asked Mrs. Munn if she wanted to talk with the defendant "by himself," and Officer Guthrie then asked the defendant if he wanted to "talk to momma by yourself." The officers then excused themselves from the room, closed the door, and left the defendant and his mother alone.

Since the microphone and video recording system in the interview room were hidden, there was no visible indication that someone could listen to the private conversation between the defendant and his mother. After excusing himself, Officer Guthrie immediately went to the private room where all of the defendant's conversations were being monitored as he spoke and were being recorded for later use.

The police officers' collective actions in turning off the audio tape recorder at the defendant's request; asking if he wanted to talk alone with his mother; excusing themselves from the room; and closing the door both deceived and assured the defendant and his mother that they would be free to talk in private without anyone hearing their conversation.

In support of its argument that the defendant did not have a subjective expectation of privacy, the State points out only that the defendant and his mother leaned in close to each other as they spoke and also that the two spoke in more hushed tones than when others were present. We disagree that these facts standing alone indicate that the defendant and his mother thought that someone could monitor or record their conversation. Instead, these facts suggest the delicate and candid nature of the conversation and demonstrate that the defendant and his mother were relying on the officers' assurances of privacy.

Accordingly, we hold that the defendant had a subjective expectation of privacy in the conversation that he had alone with his mother in the interview room. We also hold that the subjective expectation of privacy continued during the later conversations that the defendant had while alone with his father in the interview room. These later conversations also took place after the officers agreed to shut off the audio tape recorder, left the room, and closed the door to assure privacy. There were no intervening circumstances that suggest the defendant and his father were not relying on the officers' prior assurances or that the defendant did not have a subjective expectation of privacy in the later conversations.

Under the second prong of the test, we must determine whether the defendant's subjective expectation of privacy was reasonable and justified under the circumstances. Since this is an issue of first impression in Tennessee, we look to other courts for guidance.

Both the State and a majority of the Court of Criminal Appeals primarily relied upon *United States v. Hearst*, in which the defendant challenged the secret recording of a conversation between herself and her visitor, which took place in the jail visiting room over a telephone-like communication system while the two looked at each other through a bullet-proof glass window. 563 F.2d 1331, 1344 (9th Cir.1977). The conversation was monitored and recorded through a switchboard-type device operated by a deputy sheriff pursuant to an established jail policy to watch for security problems within the jail. *Id.* The Ninth Circuit Court of Appeals stated:

An intrusion by jail officials pursuant to a rule or policy with a justifiable purpose of imprisonment or prison security is not violative of the Fourth Amendment. Under this rule, a prisoner is not

deprived of all Fourth Amendment protections; the rule recognizes, however, the government's weighty, countervailing interests in prison security and order.

*Id.* at 1345 (citations omitted). As a result, the court found that the defendant's Fourth Amendment rights had not been violated and noted that the government "adequately established that its practice of monitoring and recording prisoner-visitor conversations was a reasonable means of maintaining prison security." *Id.* at 1346; *cf. State v. Scheineman,* 47 S.W.3d 754, 757 (Tex.App.2001) (holding that "[w]here a law enforcement official lulls a defendant into believing his conversation with another will be confidential by allowing the defendant to speak privately with the other individual ... but secretly records the conversation solely for purposes of gathering evidence, the defendant's subjective expectation is objectively reasonable by societal standards").[1]

Although we agree that the policy of maintaining prison security is a legitimate factor that may bear upon the objective reasonableness of an expectation of privacy, we disagree with the Court of Criminal Appeals' application of these standards to the facts of this case. After entering the interview room where the defendant and the officers talked alone, Mrs. Munn pleaded with the defendant to tell the officers what he knew. Afterwards, the officers told Mrs. Munn that they thought the defendant had killed the victim. The officers then asked the defendant and his mother if

they would like to talk alone. After the defendant agreed that he would like to be alone with his mother, the officers left the room and closed the door. As stated above, at this point, the defendant had a subjective expectation of privacy in his conversations. Moreover, Officer Guthrie testified at trial that the purpose of recording the conversations in the interview room was just in case the officers "miss something that [they] don't write down and can't remember at a later date...." The record is silent, however, as to any alleged purpose for officers to monitor the conversations as they occurred.

In short, there is simply no evidence in the record that the conversations were recorded for security purposes and no evidence that the practice of recording conversations in the interview room of this police station was based on a policy or rule with a justifiable purpose of maintaining security. Moreover, when viewed with the circumstances indicating that the officers both deceived and assured the defendant and his parents that they were free to talk in private, we conclude that the expectation of privacy was reasonable and justified.

### Federal and State Wiretapping Laws

In addition to the Fourth Amendment and state constitutional violation, the defendant asserts that his rights under Title III of the Omnibus Crime and Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq.,* and under the Wiretapping and Electronic Surveillance Act of 1994, Tenn.

---

1. The State and the Court of Criminal Appeals also relied upon *State v. Wilkins,* in which the defendant was read his *Miranda* rights, was interrogated in the police station booking room, and was later allowed to speak alone with his parents in the booking room. 125 Idaho 215, 868 P.2d 1231, 1232 (1994). Although the Idaho Supreme Court accepted the State's argument that there was a "neces-

sity for surveillance," we note that *Wilkins* involved the questioning of an individual who had been arrested, whereas *Hearst* involved conversations with a prisoner. In any event, we wish to stress that simply asserting that there is a need for surveillance or monitoring for security purposes is not sufficient if other circumstances reveal an objective and reasonable expectation of privacy.

Code Ann. § 40–6–301, *et seq.*, have been violated.

18 U.S.C. § 2511(1)(a) prohibits the admission of communication evidence if a person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." Furthermore, "oral communication" is defined as "any oral communication uttered by a person exhibiting *an expectation that such communication is not subject to interception under circumstances justifying such expectation.*" 18 U.S.C. § 2510(2) (emphasis added).

Similarly, Tennessee statute states, "The interception of wire, oral or electronic communications, . . . when no party to the communications has consented to the interception, should be allowed only under compelling circumstances when authorized and supervised by a court of competent jurisdiction and upon a finding of probable cause." Tenn.Code Ann. § 40–6–302(b) (Supp.1996). In addition, "oral communication" is defined as "oral communication uttered by a person exhibiting *an expectation that such communications is not subject to interception under circumstances justifying such expectation. . . .*" *Id.* § 40–6–303(14) (Supp.1996) (emphasis added).

■ Although we have not addressed the provisions of the Tennessee wiretapping law, other states have interpreted similar statutory provisions and have concluded that the standard for determining the extent of protection under the federal and state wiretap laws is the same standard employed in the Fourth Amendment cases: (1) whether the individual had an actual, subjective expectation of privacy, and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances. *See State v. Hauss,*

142 Ariz. 159, 688 P.2d 1051 (Ct.App.1984); *State v. Wilkins,* 125 Idaho 215, 868 P.2d 1231 (1994). Since the federal standard regarding expectation of privacy reflects the standard applied under the Tennessee Constitution, we are persuaded that this is an appropriate interpretation and adopt the standard of the Fourth Amendment cases as the test under Tennessee statutes as well.

Applying this standard to the facts we have previously outlined in the Fourth Amendment and Tennessee Constitutional analysis, we conclude that there was an intentional interception by the police of an oral communication without consent and that the defendant had a justified expectation that the communication was not subject to interception. Accordingly, we hold that the defendant had a reasonable expectation of privacy and his statements should have been suppressed as violations of the federal and Tennessee wiretapping statutes.

### *Harmless Error Analysis*

We must now determine the effect of the trial court's failure to suppress the defendant's statements in violation of the above constitutional and statutory provisions. In *Chapman v. California,* the United States Supreme Court stated the test for harmless constitutional error as follows:

> [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This Court has likewise applied the harmless beyond a reasonable doubt standard to errors of constitutional magnitude. *See Momon v. State,* 18 S.W.3d 152, 166 (Tenn.1999).

■ In applying this standard to the facts of this case, the record reflects that

the officers were present when the defendant admitted to shooting the victim over money and a gun. The defendant's statements to the officers were clearly probative of his premeditation and intent in killing the victim and in establishing the elements of first-degree murder. The defendant's statements to his parents, while more detailed and inflammatory, were largely duplicative in terms of establishing the elements of the offense and the defendant's guilt. Thus, we conclude that the error was harmless beyond a reasonable doubt with respect to the guilt phase of the trial.

The issue of whether the error was harmless beyond a reasonable doubt with respect to sentencing is more difficult. While alone with his parents, the defendant was very specific regarding his feelings for the victim and was very detailed in his explanation of the murder. For example, the defendant stated that the victim "was a dirty little son-of-a-bitch." Furthermore, the defendant referred to himself as a psychopath when explaining why he did not feel remorse for killing the victim. These remarks were highly inflammatory and prejudicial to the defendant, and we cannot conclude beyond a reasonable doubt that the jury did not consider these statements, while weighing the aggravating and mitigating circumstances in the sentencing phase of the case. Therefore, we hold that although the error was harmless beyond a reasonable doubt as to the guilt phase of trial, the error was not harmless beyond a reasonable doubt as to the sentencing phase of trial.

## MIRANDA

■ The defendant argues that his videotaped statements should have been suppressed because he was not advised of his Miranda rights. The State maintains, however, that the Miranda warnings were not required because the defendant was not in custody.

In Miranda v. Arizona, the United States Supreme Court held that before custodial interrogation can take place, the police must inform the individual that (a) he has the right to remain silent; (b) any statement made may be used as evidence against him; (c) he has the right to the presence of an attorney; and (d) if he cannot afford an attorney, one will be appointed for him prior to questioning, if he so desires. 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "Custodial interrogation" was defined by the Miranda court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id.

In State v. Anderson, this Court discussed the appropriate inquiry to determine whether an individual is "in custody" for purposes of Miranda. 937 S.W.2d 851 (Tenn.1996). We stated the test as "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." Id. at 855. Factors relevant to this determination include:

[1] the time and location of the interrogation; [2] the duration and character of the questioning; [3] the officer's tone of voice and general demeanor; [4] the suspect's method of transportation to the place of questioning; [5] the number of police officers present; [6] any limitation on movement or other form of restraint imposed on the suspect during the interrogation; [7] any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal

or nonverbal responses; [8] the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, [9] the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* In *Anderson,* we concluded that "[t]he listed factors are by no means exclusive.... It is a very fact specific inquiry. Application of the appropriate, relevant factors to the facts is a task for which the trial court is especially suited." *Id.*

With these principles in mind, we turn to the facts of this case. After contact from the Murfreesboro Police, the defendant voluntarily agreed to go to the police station to clear up discrepancies the officers had found in his statement. The defendant and his family arrived at the police station at approximately 5 p.m. The interview was conducted in a 12 × 12 foot room marked "Felony Booking Room." Throughout the duration of the interview, the defendant talked with the officers while one or both of his parents was present; with the officers alone; and with one or both of his parents alone. After approximately 3 ½ to 4 hours, the defendant was formally arrested.

While talking to the officers alone, the defendant was vigorously questioned by the officers and at certain times, the defendant was even accused of not telling the truth or at least not telling the whole truth. The officers even told the defendant's mother, in the presence of the defendant, that they knew that the defendant had killed the victim. However, even though the officers were extremely inquisitive and often times accusatory, we agree with the Court of Criminal Appeals' observation that the officers' demeanor was always polite and courteous towards the defendant. The defendant was reminded throughout the interview that he was not under arrest and was free to leave at any time. However, on at least three occasions, the defendant mentioned that he would like to come back the following Monday and talk to the officers when his parents were not present. On each occasion, it appears that the officers either changed the subject or kept pressing the defendant to tell the truth. Near the end of the interview, the defendant indicated that he thought he could go home and the officers advised him that he would be arrested that night. This is the first evidence in the record that the defendant wanted to leave the room and that he . would be detained.

Although the question is close, considering the evidence as a whole, we agree with the Court of Criminal Appeals that the evidence in the record does not preponderate against the lower court's finding that the defendant was not in custody when he was interviewed by the officers.

### DERIVATIVE EVIDENCE RULE

■ In this case, we have held that the defendant's rights under the Fourth Amendment of the United States Constitution and article I, § 7 of the Tennessee Constitution were violated by the secret taping of his conversations with his parents while alone in the interview room. Furthermore, we have held that there was not a violation of the defendant's rights under *Miranda* because the defendant was not in custody before he was presented with the *Miranda* warnings. Therefore, our analysis deals with whether the violations under the Fourth Amendment and article I, § 7 of the Tennessee Constitution require that all later statements made by the defendant be suppressed.

In *United States v. Bayer,* the United States Supreme Court stated:

Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.

331 U.S. 532, 540, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). This theory has been termed the "cat out of the bag" theory. *See State v. Smith,* 834 S.W.2d 915, 919 (Tenn.1992). In *Smith,* we stated:

In each such case, the crucial inquiry for the courts becomes whether the events and circumstances surrounding and following the initial, illegal conduct of the law enforcement officers prevented the accused from subsequently (1) making a free and informed choice to waive the State constitutional right not to provide evidence against one's self, and (2) voluntarily confessing his involvement in the crime.

*Id.* at 919.

In this case, the initial, illegal conduct consists of the secret taping of the defendant's private conversation with his mother in violation of his rights under the Fourth Amendment of the United States Constitution and article I, § 7 of the Tennessee Constitution. After confessing to his mother, the defendant told his mother to get the officers so that he could confess to the murder. At this point, the defendant was not aware that the officers had observed his conversation with his mother, and the "cat" was not then out of the bag. Only after Mrs. Munn told the officers,

"He says he shot [the victim]," was the "cat" out of the bag. Mrs. Munn's statement was a direct result of the defendant's request for her to get the officers. The defendant's decision to confess to the police was the result of his independent, free will and not a result of improper police conduct. Therefore, we hold that the initial, illegally taped confession did not prevent the exercise of the defendant's independent, free will to confess to the officers and that suppression of the later statements made by the defendant in the presence of the officers is not required.

### REQUEST FOR MODIFIED TENNESSEE PATTERN JURY INSTRUCTION

The defendant argues that the trial court erred by failing to give the no-adverse-inference instruction at the penalty phase of the trial as he requested. The no-adverse-inference instruction is located at Tennessee Pattern Jury Instruction 43.03 and reads as follows:

The defendant has not taken the stand to testify as a witness but you shall place no significance on this fact. The defendant is presumed innocent and the burden is on the state to prove his guilt beyond a reasonable doubt. He is not required to take the stand in his own behalf and his election not to do so cannot be considered for any purpose against him, nor can any inference be drawn from such fact.

Tenn. Pattern Instructions—Criminal 43.03 (3d ed.1992).

This Court has previously held that a trial court's failure to give a no-adverse-inference instruction, where the defendant has not requested the instruction, is not error. *See State v. Porterfield,* 746 S.W.2d 441 (Tenn.1988); *Rowan v. State,* 212 Tenn. 224, 369 S.W.2d 543 (1962). We have not, however, addressed the issue as currently before us: whether a defendant

has a constitutional right to a no-adverse-inference instruction at the penalty phase of a trial, when properly requested. Since this is an issue of first impression in Tennessee, we look to other cases for guidance.

In *Carter v. Kentucky*, the United States Supreme Court addressed the issue of whether a defendant has a constitutional right to a no-adverse-inference instruction in the guilt phase of a bifurcated trial. 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). In *Carter*, the defendant chose not to testify during the guilt phase of the trial. *Id.* at 293, 101 S.Ct. 1112. Before closing arguments, the defendant requested, and the trial court refused to give, a no-adverse-inference instruction. *Id.* at 294, 101 S.Ct. 1112. The Supreme Court concluded that a trial court is required to give a no-adverse-inference instruction during the guilt phase of a trial when requested by the defendant. *See id.* at 300, 101 S.Ct. 1112. The Court noted further that the instruction on the presumption of innocence does not eliminate the need for the no-adverse-inference instruction where requested. *See id.* at 304, 101 S.Ct. 1112.

In *Finney v. Rothgerber*, the Sixth Circuit Court of Appeals addressed the issue of whether the no-adverse-inference instruction was required at the second phase of a bifurcated trial. 751 F.2d 858 (6th Cir.1984). In that case, the defendant, who was free on bail, failed to return to the court room after lunch. *Id.* at 859. Since opening statements had already been made and the defendant was aware of the time court was to resume, the trial court proceeded without the defendant. *Id.* at 859–60. Although defense counsel made the request, the trial court refused to instruct the jury that "[t]he defendant is not compelled to testify and the fact that he does not, cannot be used as an inference of guilt and should not prejudice him

in any way." *Id.* at 860. The Sixth Circuit held:

> The due process clause requires a trial court, if requested, to instruct the jury during the enhancement portion of a bifurcated trial of one charged as a persistent felony offender that no adverse inference may be drawn from defendant's failure to testify. This requirement applies regardless of whether the defendant has testified during the trial of the underlying substantive offense.

*Id.* at 863–64. The court went on to hold that due to the overwhelming evidence at the second phase of the trial, including the defendant's failure to return to court, the error was harmless beyond a reasonable doubt. *Id.* at 865.

██ In the present case, a no-adverse-inference instruction was given during the guilt phase of the trial. The defendant requested that the instruction also be given during the penalty phase of the trial, but the trial court refused. In this case, the trial court gave the following instruction at the penalty phase:

> The burden of proof is upon the state to prove any statutory aggravating circumstance or circumstances beyond a reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case.

*See* Tenn. Pattern Instructions–Criminal 7.04 (3d ed.1992).

The United States Supreme Court has established that a criminal defendant has a constitutional right to a no-adverse-inference instruction during the guilt phase of a trial when properly requested. *See Carter v. Kentucky*, 450 U.S. at 300, 101 S.Ct. 1112. We believe that the right against self-incrimination is so fundamental that this right should be protected at all stages of the criminal process. We therefore agree with the United States Supreme Court in that "[w]e can discern no basis to

**502**

distinguish between the guilt and penalty phases of [a] capital murder trial so far as the protection of the Fifth Amendment privilege is concerned." *See Estelle v. Smith,* 451 U.S. 454, 462–63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Accordingly, we hold that in Tennessee a criminal defendant has a constitutional right to a no-adverse-inference instruction, when properly requested, at both the guilt and the penalty phase of the criminal trial. Because this case is being remanded for resentencing on other grounds, there is no need to decide whether the error in this case was harmless error.

### CONCLUSION

After a thorough review of the record and relevant authority, we hold that the defendant had a reasonable expectation of privacy and that his rights under the Fourth Amendment to the United States Constitution, article I, § 7 of the Tennessee Constitution, and federal and state wiretapping statutes were violated by the secret taping of his conversations in the police interview room. We also conclude that the defendant was not entitled to *Miranda* warnings because he was not in custody when interviewed and that his confession was not subject to suppression under the derivative evidence rule. Finally, we conclude that the defendant was entitled to have the no-adverse-inference instruction given to the jury during the sentencing phase of the trial. Accordingly, we affirm in part, reverse in part, and remand to the trial court for a new sentencing hearing in accordance with this opinion.

It appearing that the defendant is indigent, the costs of appeal are taxed to the State of Tennessee.