# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 13, 2002 Session

## STATE OF TENNESSEE v. RICHARD D. BATEY

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-B-1035     Steve R. Dozier, Judge**

---

**No. M2001-02958-CCA-R3-CD - Filed March 19, 2003**

---

The appellant, Richard D. Batey, pled guilty in the Davidson County Criminal Court to one count of possession of more than .5 grams of a substance containing cocaine with intent to sell, a Class B felony.  The trial court sentenced the appellant to eight years split confinement, with one year to be served in confinement and the remaining seven years to be served in the community corrections program.  Pursuant to the plea agreement, the appellant reserved the right to appeal as a certified question of law the trial court's denial of his motion to suppress.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

James O. Martin, III, Nashville, Tennessee, for the appellant, Richard D. Batey.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Jon P. Seaborg, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I.  Factual Background

Officer David Goodwin of the Nashville Metropolitan Police Department testified at the suppression hearing that, around 4:00 p.m. on November 21, 2000, he observed the appellant in the front yard of a house at 1000 Stockell Street.  Officer Goodwin, who was familiar with the appellant, knew there were outstanding warrants for the appellant's arrest.  After Officer Goodwin verified that the appellant's arrest warrants were still outstanding, he observed the appellant enter the house with two other individuals. Officer Goodwin "maintained visual contact of the residence" and called for backup.  When backup arrived, several officers positioned themselves around the house, while Officer Goodwin and Officer McDavis approached the front door.

Officers Goodwin and McDavis knocked on the door and announced their presence. After knocking, the officers "heard a lot of running in the house, shuffling, scuffling about[,] but no one was coming to the door." The officer positioned at the back door radioed Officer Goodwin and advised him that an individual had looked out the back door window. Officer Goodwin continued to knock. After more than five minutes had elapsed, the door opened and the officers immediately smelled "the odor of burning marijuana." The appellant, who was standing in the doorway, attempted to move toward the officers, but Officer Goodwin said, "No, Richard, I need to see your hands. Everybody get your hands out. Need to see your hands."[1] The officers then entered the house to arrest the appellant.

From their position just inside the front door, the officers observed a "bar" in the next room that had a box of "baggies," several empty "baggies," and a box of baking soda on it and "white powder everywhere." The officers could also see into the kitchen where they observed "water [in a pan] on the stove." Based upon prior experience, the officers immediately assumed the individuals "were cooking crack cocaine." As the officers were taking the appellant into custody, they also observed .45 Magnum shells on the floor in a bedroom to the right of the front door. The officers secured the appellant and four other individuals in the front room of the house and "started to walk through the house for a cursory search for weapons or any more people in the house." The officers recovered an AK-47 magazine that was visible under a sofa cushion because "the cushion didn't lay flat."

The officers continued their protective sweep, announcing "police" as they proceeded through the house. In a small utility room with a dropped ceiling, Officer Goodwin noticed that one of the ceiling panels was "cocked." Officer Goodwin explained that "this wasn't your typical new drop ceiling. This ceiling had wood dividers, two-by-fours and two-by-sixes, which would've been strong enough to support someone's weight." Officer Goodwin shouted, "Metro Police. Anybody up in there?" Because he was "vertically challenged" and could not see into the ceiling space, Officer Goodwin asked Officer Marklein, who was much taller, to investigate. Officer Marklein "kinda put his hands up, to kinda look" into the ceiling space and pulled out a red velour pillow with a zipper, which he tossed to Officer Goodwin. Officer Goodwin testified that, because the pillow contained little stuffing, "it was immediately apparent what was inside that pillow. . . . Based on the totality of the circumstances, what we'd seen[,] I felt that I was probably feeling crack cocaine." Officer Goodwin unzipped the pillow and discovered five bags of a white rock substance.

Officer Goodwin carried the pillow and its contents into the front room. After advising the individuals of their rights, Officer Goodwin asked to whom the pillow belonged. The appellant claimed that the pillow was his. While at the scene, the officers tested the white rock substance found in each of the bags recovered from the pillow. The substance tested positive for

---

[1] Officer Goodwin related that, at the time of the offense, the appellant used crutches to walk.

cocaine.[2] The officers also tested the white powder found on the bar, which powder also tested positive for cocaine. The officers took into custody the pillow, the bags of cocaine, and the ammunition, as well as "a small bag of marijuana and a lot of drug paraphernalia."

Prior to trial, the appellant filed a motion to suppress the evidence seized in conjunction with his arrest. At the conclusion of the suppression hearing, the trial court took the matter under advisement and subsequently issued an order denying the appellant's motion to suppress. The trial court found that "(1) Officer Goodwin was justified in searching the [appellant's] home for the purposes of a protective sweep; and (2) the contraband found in the pillow case [sic] [was] not subject to suppression under the plain feel doctrine." Thereafter, the appellant pled guilty to possession of more than .5 grams of a substance containing cocaine with intent to sell. Pursuant to the plea agreement, the appellant reserved the right to appeal as a certified question of law the trial court's denial of his motion to suppress. See Tenn. R. Crim. P. 37(b)(2)(i). The questions before this court are (1) "whether the warrantless entry into the house by the police in this case was unreasonable in violation of the [Fourth] Amendment to the United States Constitution and Article One, Section Seven of the Tennessee Constitution" and (2) "whether the warrantless search and seizure of the pillowcase located in the house was unreasonable in violation of the [Fourth] Amendment to the United States Constitution and Article One, Section Seven of the Tennessee Constitution."[3]

## II. Analysis

A trial court's findings of fact in a suppression hearing will be upheld on appeal unless the evidence preponderates against those findings. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

> Questions of credibility of the witnesses, the weight and value of the
> evidence, and resolution of conflicts in the evidence are matters
> entrusted to the trial judge as the trier of fact. The party prevailing in
> the trial court is entitled to the strongest legitimate view of the
> evidence adduced at the suppression hearing as well as all reasonable
> and legitimate inferences that may be drawn from that evidence.

Id. However, the application of the law to the trial court's findings of fact is a question of law subject to de novo review. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the Fourth Amendment to the United States Constitution and Article 1, section 7 of the Tennessee Constitution prohibit unreasonable searches and seizures by law enforcement officers. The purpose of the Fourth Amendment and Article 1, section 7 is to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001) (quoting State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997)); see

---

[2] The five bags containing the white rock substance were also sent to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing. The record does not indicate the results of the TBI's testing.

[3] In the "Agreed Order" referenced in the judgment of conviction, all parties agreed that these issues were dispositive of the case. See Tenn. R. Crim. P. 37(b)(2)(i).

also State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (noting that Article 1, section 7 is identical to the Fourth Amendment in intent and purpose). "'Consequently, under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.'" State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (quoting Yeargan, 958 S.W.2d at 629); see also Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971).

In Payton v. New York, 445 U.S. 573, 603, 100 S. Ct. 1371, 1388 (1980), the United States Supreme Court held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Incident to the arrest, "the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Maryland v. Buie, 494 U.S. 325, 334, 110 S. Ct. 1093, 1098 (1990). Beyond that, the arresting officers may conduct a limited protective sweep of the suspect's dwelling when the officers possess "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 337, 110 S. Ct. at 1099-1100;[4] see also State v. Wilson, 687 S.W.2d 720, 724 (Tenn. Crim. App. 1984). A protective sweep is limited to "a cursory inspection of those spaces where a person may be found. The sweep [may last] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Buie, 494 U.S. at 335-36, 110 S. Ct. at 1099 (footnote omitted).

We note that the record before us does not indicate whether the house at 1000 Stockell Street belonged to the appellant or a third party.[5] Officer Goodwin testified at the suppression hearing that initially the appellant stated that he lived at that address; however, after the officers discovered the AK-47 magazine and pillow and asked the appellant for consent to search the rest of the house, the appellant replied, "Naw, I don't live here." The other individuals, two of whom Officer Goodwin had arrested the previous week, also denied living in the house. Nevertheless, because the name on the arrest warrant was that of the appellant and because in ruling upon the motion to suppress the trial court concluded that the appellant lived at that address, we will

---

[4] In Buie, the defendant argued that the officers were required to obtain a search warrant before searching the house for dangerous persons. However, the Supreme Court noted that "the arrest warrant gave the police every right to enter the home to search for [the defendant]. Once inside, the potential for danger justified a standard of less than probable cause for conducting a limited protective sweep." Buie, 494 U.S. at 334, 110 S. Ct. at 1098 n.1.

[5] In its appellate brief, the State questioned in a footnote whether the appellant had standing to challenge the search in this case. We note that the "failure on the part of the [S]tate to raise the issue of standing at trial serves as a waiver of the issue on appeal." State v. Landon Gaw, No. 01C01-9410-CC-00351, 1995 Tenn. Crim. App. LEXIS 875, at *9 (Nashville, Oct. 26, 1995) (citing State v. White, 635 S.W.2d 396, 399-400 (Tenn. Crim. App. 1982)). Our review of the record reveals that the State did not file a response to the appellant's motion to suppress, nor did the State challenge the appellant's standing at the suppression hearing. Because the State failed to raise the issue of standing in the trial court, the issue has been waived on appeal.

apply the law as set forth in Payton. See State v. Jeffrey K. Shaw, No. M2001-00563-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 32, at **7-8 (Nashville, Jan. 9, 2002), perm. to appeal denied, (Tenn. 2002).

The appellant asserts that, because he attempted to exit the house, "there was no circumstance which necessitated the officers' entrance into the residence." We disagree. As previously noted, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton, 445 U.S. at 603, 100 S. Ct. at 1388. Officer Goodwin observed the appellant in the yard and called to verify that there were outstanding warrants for the appellant's arrest. The appellant has not challenged the validity of those warrants. Thereafter, the appellant and two individuals entered the house. Thus, Officer Goodwin had reason to believe the appellant was inside the house. Moreover, Officer Goodwin testified that when the door finally opened, the appellant "was standing just inside the door there, and at that point [the officers] stepped in, placed him in custody." Officer Goodwin explained that he and Officer McDavis entered the house while taking the appellant into custody in order to "have a visual of the people in front of us . . . [and ensure] that nobody had a gun in their hands." In fact, Officer Goodwin recognized two of the individuals as persons he had arrested the previous week. Based upon these circumstances, we conclude that the officers had the authority to enter the house to effectuate the appellant's arrest. Shaw, No. M2001-00563-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 32, at *9.

Next, the appellant challenges the seizure, from the ceiling, of the pillowcase containing the crack cocaine. The appellant submits that he is not challenging the authority of the officers to "look in the ceiling," provided the officers were lawfully inside the house. Rather, the appellant argues that

> there were no reasonable, articulable facts relating to officer safety
> which could justify the seizure of the pillowcase. . . . If the possible
> contents of a pillowcase hidden in the ceiling of a house which has
> been entered without a warrant can be searched pursuant to a theory
> of officer safety, what, then, is protected?

As previously noted, the Fourth Amendment permits a limited protective sweep in conjunction with an in-home arrest when the officers possess a reasonable belief based on specific and articulable facts that there may be individuals hiding in the house who pose a threat to the officers. Buie, 494 U.S. at 337, 110 S. Ct. at 1099-1100; Wilson, 687 S.W.2d at 724. However, the protective sweep is limited to a cursory inspection of those spaces in which a person might be hiding and may last no longer than necessary to dispel the suspicion and complete the arrest. Buie, 494 U.S. at 335-36, 110 S. Ct. at 1099.

The officers in this case were well-justified in conducting a protective sweep. First, after knocking numerous times, the officers "heard a lot of running in the house, shuffling, scuffling about[,] but no one was coming to the door." It was not unreasonable to conclude that individuals inside the house may have been going into hiding. When the door finally opened more than five

minutes later, the officers observed the appellant just inside the front door and smelled the odor of burning marijuana.  Additionally, when the officers entered the house to arrest the appellant, they noticed ammunition on the floor and what appeared to be materials used in making "crack cocaine." Clearly, the officers possessed a reasonable belief based on specific and articulable facts that there might be individuals hiding in the house who posed a danger to the officers, justifying a protective sweep.

We also conclude that the officers were justified in searching the ceiling.  Officer Goodwin testified that the utility room had a dropped ceiling constructed of "two-by-fours and two-by-sixes, which would've been strong enough to support someone's weight."  Upon entering the utility room, Officer Goodwin noticed that one of the ceiling panels was "cocked."  Officer Goodwin announced the officers' presence and asked if anyone was hiding in the ceiling.  Because the officers reasonably believed that someone may have been hiding in the ceiling, we conclude that they were justified in searching the ceiling space.  However, the appellant argues that, even if the officers were justified in conducting a protective sweep, "there were no reasonable, articulable facts relating to officer safety which could justify the seizure of the pillowcase."  Again, we disagree.

In Minnesota v. Dickerson, 508 U.S. 366, 373, 113 S. Ct. 2130, 2136 (1993), the Supreme Court established the "plain feel" doctrine, holding that "police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by [Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968)]."  The Court observed that

> [t]he rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no "search" within the meaning of the Fourth Amendment – or at least no search independent of the initial intrusion that gave the officers their vantage point.  The warrantless seizure of contraband that presents itself in this manner is deemed justified by the realization that resort to a neutral magistrate under such circumstances would often be impracticable and would do little to promote the objectives of the Fourth Amendment.

Dickerson, 508 U.S. at 375, 113 S. Ct. at 2137 (citations omitted).  The Court concluded that this same rationale applied to the "tactile discoveries of contraband" during a lawful patdown of a suspect.  Id.  Likewise, we conclude that this rationale applies to the tactile discovery of contraband during a lawful protective sweep.

A protective sweep is a limited search incident to arrest in a home to ensure the safety of the arresting officers.  As in a Terry frisk, the interest in allowing officers to take reasonable steps to ensure their safety "is sufficient to outweigh the intrusion such procedures may entail."  Buie, 494 U.S. at 334, 110 S. Ct. at 1098.  Indeed, "[t]he risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter."  Buie, 494 U.S. at 333, 110 S. Ct. at 1098.  Because a protective sweep places the officers in a lawful vantage point, there is "no invasion of a legitimate expectation of privacy."  Dickerson, 508 U.S. at

375, 113 S. Ct. at 2137. Thus, we conclude that police officers may seize contraband detected during a lawful protective sweep. However, we emphasize that such a seizure will be upheld only when the officer conducts a limited protective sweep in conjunction with an in-home arrest where the officer possesses "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 337, 110 S. Ct. at 1099-1100. The validity of a seizure under the "plain feel" doctrine will turn upon the facts in each individual case. We now consider the "plain feel" doctrine in determining the validity of the seizure of the pillow in the instant case.

In State v. Bridges, 963 S.W.2d 487, 494 (Tenn. 1997) (citing Dickerson, 508 U.S. at 376-77, 113 S. Ct. at 2137), our supreme court articulated the requirements for the seizure of evidence under the "plain feel" doctrine in Tennessee:

> (1) a prior valid reason exists for the intrusion . . . ;
> (2) the contraband is detected while the Terry search for weapons legitimately is still in progress; and,
> (3) the incriminating nature of the object perceived by the officer's sense of touch is immediately apparent giving the officer probable cause to believe the object is contraband prior to its seizure.

Clearly, in the instant case, the first two requirements of Bridges are met. As previously stated, the protective sweep was justified under Buie. Moreover, the contraband was detected while the protective sweep legitimately was still in progress. Officer Marklein searched the ceiling space to ensure that no one was hiding there. Thus, as in Bridges, the "[l]egality of the seizure in this case turns on the third prerequisite." Id. at 494. Accordingly, we must determine whether the incriminating nature of the evidence in the pillowcase perceived by Officer Goodwin's sense of touch was immediately apparent, giving the Officer Goodwin probable cause to believe the object was contraband prior to its seizure. Id.

Although Officer Goodwin testified that "it was immediately apparent what was inside that pillow," our supreme court noted in Bridges,

> Courts should not surrender their common sense assessment of the sensory capacities of human touch to an officer's assertion that he or she "immediately knew" the nature of the object touched. The officer's subjective belief that the object is contraband is not sufficient unless it is objectively reasonable in light of all the circumstances known at the time of the search. An officer's testimony is a factor in determining the legality of a seizure under the plain feel doctrine, but it is not dispositive and does not end a court's inquiry.

Id. at 494-95 (citations omitted).

We conclude that Officer Goodwin's belief that what he felt in the pillowcase was "crack cocaine" was objectively reasonable in light of the totality of the circumstances at the time of the search. As previously stated, the individuals inside the house acted suspiciously by taking an

excessive amount of time to open the door and "running and shuffling" around inside the house. Moreover, once inside, the officers observed in plain view "baggies," baking soda and "white powder everywhere." The officers also observed "water [in a pan] on the stove." Based upon prior experience, the officers immediately believed the individuals "were cooking crack cocaine." Finally, Officer Goodwin testified that the pillow did not contain much "stuffing" and "[f]elt like it was full of rocks." These circumstances provided Officer Goodwin with probable cause to believe the pillowcase contained contraband. Thus, the seizure was justified under the "plain feel" doctrine.

### III. Conclusion
Accordingly, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE