IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 25, 2005 Session

## STATE OF TENNESSEE v. RONALD E. WADE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-D-1971     Steve Dozier, Judge**

---

**No. M2004-02888-CCA-R3-CD - Filed March 15, 2006**

---

Following a jury trial, Defendant, Ronald E. Wade, was convicted of one count of facilitation of possession of over twenty-six (26) grams of cocaine for sale, a Class C felony, one count of facilitation of possession of over one and one-half ounces of marijuana for sale, a Class A misdemeanor, and one count of facilitation of possession of a weapon in commission of an offense, also a Class A misdemeanor. Defendant received a sentence of four years for the felony conviction, suspended after thirty days incarceration, with four years of probation, and a one thousand dollar fine. He received a suspended sentence of eleven months and twenty-nine days, to be served on probation, for each misdemeanor conviction. All sentences were ordered to be served concurrently with each other. On appeal, Defendant argues that the trial court erred in denying his motion to suppress all evidence obtained pursuant to a warrant authorizing a search of his house. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right, Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

Charles R. Ray, Nashville, Tennessee, for the appellant, Ronald E. Wade.

Paul G. Summers, Attorney General and Reporter; Seth P. Kestner, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Pamela Sue Anderson, Assistant District Attorney General, for the appellee, the State of Tennessee.

### OPINION

### I.  Background

The transcript of the jury trial is not included in the record. Only the transcript of the hearing on Defendant's motion to suppress is available.

On June 8, 2002, Sgt. Buddy Mitchell, of the Metro Police Department, responded to a call from another officer who was investigating the burglary of a vehicle on Moorman's Arm Road in Nashville. Equipment of some sort was stolen from the vehicle, and a black male and a black female were identified as the perpetrators. The male suspect was not apprehended, but the female suspect was apprehended and questioned. She told Sgt. Mitchell that the male suspect would probably take the equipment to an area known as Highland Trace. The suspect did not know the specific house number where her counterpart might take the equipment, but she described the house as being "right behind the daycare on the right." The witness also said the house had pit bulldogs in the fenced backyard.

Based on the suspect's description of the house, Sgt. Mitchell proceeded to the Highland Trace area to look for the male suspect or the possibility that the male suspect may have parked his car in front of the house. He arrived in the area between eight and nine o'clock a.m. and noticed a maroon car with a white, female driver parked outside a "known drug house." The house at 2536 Highland Trace was in the general area and fit the general description given by the black female suspect. There were two black males leaning into the window of the maroon car. Sgt. Mitchell pulled his marked police car up by the maroon car and the two males took off running. The two males ran behind the house located at 2536 Highland Trace, but Sgt. Mitchell did not pursue them behind the house. He said that based on his twenty-seven (27) years of experience as a police officer working Vice Division and working undercover, he believed he had witnessed a drug transaction.

The house at 2536 Highland Trace was approximately four or five blocks from where the initial burglary of the car had taken place. Sgt. Mitchell called immediately for backup and Officer Drew responded to the call. When Officer Drew arrived, the two policemen went to talk to the female in the maroon car. As the officers began talking to the woman, the two men who had fled around the side of the house returned to the front of the house. Sgt. Mitchell yelled "[h]ey" and the male suspects took off running again. This time, Sgt. Mitchell and Officer Drew pursued the suspects. Officer Drew caught the first subject, Mr. Clark, as he reached the corner of the other side of the house. Sgt. Mitchell caught the second subject, Mr. Pigg, on the front porch of the house. The officers immediately handcuffed the suspects. The female suspect in the car fled the scene, and the police were unable to identify her or get any information from her.

As suspect Pigg went toward the door, Sgt. Mitchell noticed that the front door was slightly open. Suspect Pigg told Sgt. Mitchell that he was at the residence of 2536 Highland Trace visiting his cousin. He also said he did not think his cousin was home. After placing Mr. Clark and Mr. Pigg in a patrol car, Sgt. Mitchell knocked on the door to determine if anyone was home who could verify whether the two suspects were actually who they said they were. When he knocked on the door, the door opened further and Sgt. Mitchell saw a microwave oven sitting on the floor by the front door. Based on his experience, Sgt. Mitchell had two concerns at that point. First, he thought that there was possibly a burglary in progress and other suspects might be inside, and second, he was concerned that there were victims in the house. He was concerned about victims because the neighborhood was frequently patrolled and from those patrols, Sgt. Mitchell knew there were women and children who lived in that area and stayed in the house.

Sgt. Mitchell repeatedly "hollered" to announce the police presence before he entered the home. He said he waited for a "pretty good while" and screamed several times as hard as possible. No one came to the door or responded to his calls. Sgt. Mitchell and Officer Drew entered the house to secure the premises and determine if there were suspects or victims inside. The house was a duplex with a living room and kitchen on the first floor and two bedrooms and a bathroom upstairs. Sgt. Mitchell saw a television on the floor in the living room and other items that appeared out of place. In the kitchen, Sgt. Mitchell saw a plate, which had a substance resembling cocaine in it, and he saw a shotgun leaning against the wall. He did not collect those items at that time because his concern was the safety of anyone who may have been in the house. After surveying the scene downstairs, he screamed upstairs to announce his presence but there was no response.

The officers proceeded upstairs and went to the first bedroom. When they opened the door there were at least three individuals sitting on the bed inside the room. Officer Drew said, "Freeze. Lemme [sic] see your hand." There was a pistol on the bed in plain view, but Sgt. Mitchell did not immediately question the individuals because the house was not yet secure. After securing the room, he proceeded to the second bedroom where a fourth individual was found, along with a second gun. The bathroom was locked, so Sgt. Mitchell asked the individuals if anyone had a key to open the bathroom because he wanted to check and make sure there were no victims inside. They responded that they did not have a key. Sgt. Mitchell then kicked the bathroom door open. There were no victims inside the bathroom, but "there was a green duffle bag with rifles sticking out of it." At this point, the house was secure because all rooms had been checked. Other officers arrived at the scene, and Sgt. Mitchell told the officers to "freeze" the scene while a search warrant was obtained. He called the Vice Division for assistance in obtaining a search warrant. Prior to getting the search warrant, the drugs remained as they were found and only the weapons were secured.

On cross-examination, Sgt. Mitchell explained that he acted as supervisor during the initial investigation, directing other officers to draw diagrams, take pictures, and interview witnesses. He stated that the affidavit in support of the search warrant was based on his and Officer Drew's observations during the initial walk through. He stated that he entered the home based on his "two-part concern" that a burglary was possibly in progress and there might be other suspects in the house, and that there was a threat to the safety of people inside the house. He admitted that he did not know why Officer Drew and the Vice Division officer failed to mention his safety concerns in their written narratives of the incident. He said that his own written narrative expressed those safety concerns, but that narrative was not available at the time of the motion to suppress hearing. Sgt. Mitchell said that neither he nor Officer Drew received consent to enter and search the house. He also said that he saw two black pit bulldogs outside the house in a cage.

Officer Charles Drew, of the Metro Police Department, testified that he has worked for the patrol division in east Nashville for approximately sixteen (16) years. On June 8, 2002, Officer Drew was working patrol when he responded to a call from Sgt. Mitchell. Officer Drew first went to Moormans Arm Road to investigate an automobile burglary. When he arrived, no one was at the scene so he proceeded to Highland Trace to meet Sgt. Mitchell. When he arrived at Highland Trace,

he saw Sgt. Mitchell's vehicle and a maroon vehicle containing a white female parked in the street. Sgt. Mitchell told Officer Drew that two black males had run from the scene.

When the black males returned to the front of the house, the officers pursued the individuals. Officer Drew apprehended Mr. Clark, handcuffed him, and placed him in the back of his patrol car. Mr. Clark was not carrying any weapons or drugs. Sgt. Mitchell likewise handcuffed Mr. Pigg and placed him in the back of Officer Drew's patrol car. Sgt. Mitchell did not relay to Officer Drew that he had observed a possible drug transaction. Officer Drew thought that these individuals may have been running because they were the burglary suspects. Officer Drew acknowledged that the Highland Trace area was patrolled frequently because the police knew that there was drug activity in the area, and they were in the process of determining what houses were involved.

Officer Drew confirmed Sgt. Mitchell's testimony that the suspects said they were visiting a cousin at the 2536 Highland Trace residence. He further confirmed that after placing the suspects in the patrol car, the two officers returned to the front porch to see if someone in the home could verify the suspect's stories. Officer Drew said that Sgt. Mitchell repeatedly knocked on the front door and screamed "[p]olice," in an effort to get someone to come to the door. The front door was already slightly open, but opened further as a result of the knocking. The officers saw a microwave sitting by the front door, and proceeded inside the house on the assumption the house was being burglarized or there were victims inside. Once inside, they saw a lawnmower, a television sitting on the floor behind a weight bench, and digital scales on top of the weight bench. The officers made the decision to secure the premises based on their belief that there was possibly a burglary in progress or victims upstairs. After repeatedly yelling "[p]olice," the officers proceeded upstairs and found four individuals in the two upstairs bedrooms. The bathroom door was locked, and the officers kicked the door in and saw a duffle bag full of weapons. At this point, the scene was secure, and the officers ceased looking or searching for anything and placed all of the individuals under arrest. Officer Drew contacted a sergeant with the Vice Division to obtain a search warrant for the premises. The items observed by Sgt. Mitchell, Officer Drew, and Detective Sgt. Damian Huggins, provided the information necessary for the affidavit in support of the search warrant. After execution of the search warrant, the individuals were charged with possession of cocaine for sale, possession of marijuana for sale, manufacture of drug paraphernalia, and felony possession of weapons.

Detective Sgt. Damian Huggins testified that currently, and at the time of the incident, he worked with the Metro Police Department, Vice Division. On the day of the incident, Sgt. Huggins was off work when he was contacted in his role as on-call supervisor for Vice Division. Dispatch notified him that a patrol unit needed assistance from the Vice Division, and that he should contact either Sgt. Mitchell or Officer Drew. He spoke with Officer Drew who explained that due to an investigation, the patrol officers were at the residence of 2536 Highland Trace, and inside the residence they found items of contraband and some illicit items in plain view. Officer Drew explained that he and Sgt. Mitchell needed assistance in obtaining a search warrant. Officer Drew told the Detective what items had been in plain view.

Detective Sgt. Huggins went to the scene to corroborate what Officer Drew had told him, before calling other Vice Division detectives. The items he observed at the scene were consistent with the items that Officer Drew had reported to him. Those items included digital scales which had residue on them, a blue baggie with several other baggies of marijuana inside, and weapons. Detective Sgt. Huggins said that these items were sufficient to meet the requirements of a search warrant. He obtained the description of the address and other information required for the warrant, and then he wrote the search warrant and had it signed by a judge. Detective Sgt. Huggins then called more Vice detectives to the scene to assist in executing the warrant.

When he first arrived at the scene, Sgt. Huggins noted that the scene was static, and no one was moving about disrupting evidence or searching for evidence. He said that the scene remained in the same condition until he returned with the warrant. Officer Drew remained at the scene as the case officer and assisted as the Vice detectives searched the residence. Items that were seized were documented on an inventory sheet and attached to the search warrant. The documentation sheet included all the items seized, who found each particular item, and the location where it was found.

The search revealed several pounds of marijuana, several ounces of cocaine, approximately seventeen guns, including: rifles, shotguns, pistols, semi-automatic pistols, revolvers, assault weapons with high-capacity magazines, and rifles with scopes. Detective Sgt. Huggins reported that four of the seized guns were loaded. He said that he believed those guns were the revolver, a semi-automatic pistol, a rifle with a scope, and an SKS assault rifle with a high-capacity magazine. Detective Sgt. Huggins verified that the search warrant and property inventory entered into evidence at the hearing were the same ones completed on the day of the search.

Earl Phillips testified that he was a guest at the 2536 Highland Trace residence on the day the incident occurred. He had stayed in the home the night before with the permission of the owner. He said the owner's first name was Ronald, but he did not know the owner's last name. Mr. Phillips said he had known Ronald for several years, and the last time they had been at the residence together was on June 7, the day before the search. Mr. Phillips identified Defendant as the person he knew as Ronald. On June 7, Mr. Phillips went to Defendant's house at around five-thirty p.m. to watch a basketball game. Defendant was leaving the house when Mr. Phillips arrived. The game was over about nine-thirty p.m., but Mr. Phillips spent the night because he fell asleep as a result of drinking. He slept upstairs where he fell asleep while watching television. Mr. Phillips did not have a key to the house. He had not asked Defendant if he could spend the night in the house, nor had Defendant instructed him to stay the night. Mr. Phillips had spent the night at Defendant's house on previous occasions with Defendant' s knowledge and permission. He said that he went to Defendant's house at least two times each week after work. On this occasion, he did not bring a change of clothes to Defendant's house with him, and he did not habitually do so. Mr. Phillips said that on the day in question, Defendant's dogs were not at the house because they were at the kennel. On cross-examination however, he admitted that he learned this information after the fact, and Defendant never told him the dogs were not at the house.

Tremayne F. Pitts testified that he had been to Defendant's house "a couple of times," and that he was at Defendant's house on the night of June 7, 2002. He arrived at Defendant's house around ten or eleven o'clock p.m., June 7. Defendant was leaving the house when Mr. Pitts arrived. Defendant gave Mr. Pitts permission to spend that night because Mr. Pitts was locked out of his own house. He had never spent the night at Defendant's house prior to this night. When he originally went to Defendant's house, he did not intend to spend the night. Mr. Pitts did not see any dogs on the premises on June 8, 2002. The police arrived at the house around six or seven o'clock in the morning. Mr. Pitts was asleep on the floor when the police arrived.

Defendant testified that he lived alone and had been leasing the premises at 2536 Highland Trace for about a year. In June 2002, Defendant owned five pit bull dogs, but they were not at the house on the day in question. At the time of the search, Defendant had gone to Memphis to see the Mike Tyson fight and his dogs were boarded with a veterinarian. The dogs remained at the veterinarian for approximately three days. Defendant said that he could get documentation from Bellshire Clinic to verify the dogs' whereabouts during the dates in question.

Prior to going out of town, Defendant left a key to his house with a friend, Justin Walker. Defendant did not ask Mr. Walker, or any of the other individuals present at the scene, to house-sit for him while he was out of town. He left for Memphis on June 7, 2002, at some point in the afternoon. Defendant saw Mr. Pitts before he left for Memphis, but it was not at eleven o'clock p.m. as Mr. Pitts testified. Mr. Pitts did not ask Defendant for permission to spend the night at Defendant's house. Defendant gave only Mr. Walker and Mr. Phillips permission to spend the night at his home. Mr. Walker had a key to all of the locks in the house, including the lock on the bathroom door.

On appeal, Defendant argues that the trial court erred in denying his motion to suppress any evidence obtained pursuant to the search warrant. He argues that the evidence should be suppressed because the initial entry into his home, which provided the basis for the search warrant, violated his Fourth Amendment rights against unreasonable searches and seizures. He asserts that the trial court impliedly found that the officers entered his home lawfully pursuant to the exigent circumstances doctrine. Defendant argues that this exception does not apply because the initial entry into his home was not based on probable cause and exigent circumstances, the necessary elements for the exigent circumstances exception to apply. Even assuming probable cause, Defendant argues that the exigent circumstances doctrine does not apply because any existing exigent circumstances were manufactured by the police. He also briefly asserts that the officers did not have circumstances necessitating their entry under the public safety function. The trial court however, concluded that the officers' entry was proper under the community caretaking or public safety functions and did not violate Defendant's Fourth Amendment rights against unreasonable searches. We affirm the trial court's finding that the search was not a violation of Defendant's Fourth Amendment rights. However, after a review of the record, we conclude that this case is appropriately analyzed under the exigent circumstances doctrine.

## II. Analysis

When reviewing the trial court's ruling regarding a pretrial motion to suppress, this Court may consider both the proof adduced at the suppression hearing and at trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). It is our duty to conduct a *de novo* review of the record with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d). It is the duty of the appellant to prepare a complete and accurate record on appeal. Tenn. R. App. P. 24(b). "[F]ailure to include a transcript of the trial makes it impossible for [this Court] to conduct an appropriate *de novo* consideration of the case or to determine whether the trial court erred relative to its determinations which were based in any part on that evidence." *State v. Hayes*, 894 S.W.2d 298, 300 (Tenn. Crim. App. 1994). Generally, where the appellant fails to submit a complete record, the trial court's determinations are presumed correct, and the judgment of the trial court is affirmed. *Id.* Nevertheless, we will address the merits of the issue presented by Defendant.

### A. Standard of Review

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this court is not bound by the trial court's conclusions of law. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Odom*, 928 S.W.2d at 23.

### B. Warrantless Entry

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Article 1, section 7 of the Tennessee Constitution, provides: "The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places without evidence of the fact committed, or to seize any person or persons not named, whose offenses are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted."

The Tennessee Supreme Court has explained that "[t]he purpose of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn. 1997) (quoting *Camara v. Municipal Ct.,* 387 U.S. 523, 528, 87 S. Ct. 1727, 1730, 18 L. Ed. 2d 930 (1967)). The court has further recognized that a warrantless search is presumed unreasonable under both the federal and state constitutions, and evidence seized from the warrantless search is subject to suppression unless the state demonstrates by a preponderance of the evidence that the search was "conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Simpson*, 968 S.W.2d 776, 780 (Tenn. 1998) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032, 29 L. Ed. 2d 564 (1971); *State v. Watkins*, 827 S.W.2d 293, 295 (Tenn. 1992)).

One exception to the warrant requirement can be found under the so-called "exigent circumstances" exception doctrine. In *State v. Tyler*, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980), this Court stated:

 "[w]arrantless searches are per se unreasonable under the Fourth Amendment unless the search falls within an exception to this rule, such as searches incident to arrest, consent searches, and searches justified by some exigency or emergency." The exigent circumstances exception includes the broadly recognized right of law enforcement officers to act in an emergency situation to protect life. Judge Warren E. Burger, later Chief Justice of the United States Supreme Court, explained in *Wayne v. United States*, 318 F.2d 205, 213, 115 U.S. App. D.C. 234, 242 (D.C. Cir. 1963), the need of officers sometimes to enter a premises without a warrant to take immediate life-saving action:

> [A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found . . . . A myriad of circumstances could fall within the terms "exigent circumstances" . . ., e.g., smoke coming out a window or under a door, the sound of gunfire in the house, threats from the inside to shoot through the door at police, *reasonable grounds to believe an injured or seriously ill person is being held within.*

*Id*. at 212 (emphasis added); *see also State v. William T. Davis,* No. M2004-03060-CCA-R3-CD, 2005 WL 225968, slip op. at *5-6 (Tenn. Crim. App. September 15, 2005) (no Tenn. R. App. P. 11 application filed).

The State bears the burden of demonstrating "exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin,* 466 U.S. 740, 750, 104 S. Ct. 2091, 2098, 80 L. Ed. 2d 732 (1984). An objective standard is used to determine the reasonableness of the officer's belief that an emergency situation existed at the moment of entry. *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 1880, 20 L. Ed. 889 (1968). The inquiry is whether the facts available to the officer at the moment of entry would 'warrant a man of reasonable caution in the belief' that the action taken was appropriate. *Carroll v. United States*, 267 U.S. 132, 162, 45 S. Ct. 280, 288, 69 L. Ed. 543 (1925). The reasonableness of that belief must be judged on the basis of the officer's knowledge at the time he or she entered the defendant's residence. *See People v. Thompson*, 770 P.2d 1282, 1285 (Colo. 1989) (citing *People v. Malczewski*, 744 P.2d 62, 66 (Colo. 1987)). In determining whether the officer acted reasonably, this Court must consider the totality of the circumstances, including the personal observations of the trained police officer and the rational inferences and deductions therefrom. *See State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992). As such, "the question is whether 'the officers would have been derelict in their duty had they acted otherwise.'" *State v. William T. Davis,* No. M2004-03060-CCA-R3-CD, 2005 WL 225968, slip op. at *5-6 (citing 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.6(a) (4th ed. 2004) (quoting *State v. Hetzko,* 283 So.2d 49, 52 (Fla. Dist. Ct. App. 1973)). "This means, of course, that it 'is of no moment' that it turns out there was in fact no emergency." *Id*. (quoting *State v. Hedley,* 593 A.2d 576, 582 (Del. Super. Ct. 1990).

In the case *sub judice,* Defendant contends that the search was unreasonable because the officers did not have probable cause and exigent circumstances warranting their entry into the residence. He argues that there was no probable cause to enter the home because the officers did not have facts linking either of the apprehended suspects to a burglary at Defendant's residence. He argues that there were no exigent circumstances because there was nothing to suggest the residence contained contraband, and no reason to believe any possible contraband would be removed before a search warrant was obtained. In essence, he argues that the officers had no reason to enter the house because they had no reason to believe that a crime was being committed or that evidence was at risk of being destroyed. He also asserts that no exigency could have been created as a result of the officers' knocking on the door because the officers had no knowledge of anyone inside the home who could dispose of those non-contraband items which gave rise to the officers' suspicion.

We conclude that the officers were justified in walking through the house to determine whether there was a burglar or an injured occupant inside the residence. Sgt. Mitchell was investigating the burglary of a vehicle when he was directed to Highland Trace as a possible drop off point for the stolen items. Sgt. Mitchell testified that when he arrived at the residence where the stolen goods may have been taken, he observed two black males leaning into the window of a maroon car driven by a white female. When the two males saw Sgt. Mitchell in the marked police car, they fled, running behind Defendant's residence. Based on his twenty-seven years of experience, Sgt. Mitchell believed the suspects were conducting a drug transaction. He called for backup and Officer Drew arrived to assist Sgt. Mitchell. The two proceeded to the maroon car to question the female. At this point, the suspects returned to the area in front of the house, and Sgt. Mitchell yelled

"[h]ey," and the suspects again took off running. This time the officers pursued and apprehended the individuals.

Sgt. Mitchell caught suspect Pigg on the front porch as he was attempting to enter Defendant's residence. As he did so, Sgt. Mitchell noticed and was concerned by the fact that the front door of the home was slightly open. Because of the suspicious activity, the officers questioned the suspects regarding their purpose at the residence. Suspect Pigg claimed to be visiting his cousin, however he did not think his cousin was home. After securing the two individuals and placing them in the patrol car, the officers returned to the front porch to verify the suspect's story. Sgt. Mitchell knocked on the door and yelled loudly to announce his presence, but received no response. When he knocked, the door opened further, revealing a microwave sitting on the floor by the front door. Sgt. Mitchell testified that it was his belief, based on his experience and his observations at the scene, that the officers had interrupted a burglary and that there may have been victims inside the house. He testified that he knew that women and children stayed in the house, and he was concerned about possible victims when no one responded to his calls.

At this point, the officers entered the house to ascertain whether there were other suspects or possible victims inside the house. In the kitchen, the officers observed a shotgun and a plate containing a substance that looked like cocaine. After repeatedly announcing their presence and receiving no response, the officers proceeded upstairs where they found four other individuals in the upstairs bedrooms. The officers secured the suspects, and then kicked in the locked bathroom door after the individuals denied having a key to open the lock. Once the officers verified that there were no victims and the house was secure, they "froze" the scene and contacted the Vice Division to obtain a search warrant.

We conclude that under the totality of the circumstances, there was probable cause for the officers to believe that a burglary was being committed and/or that victims were inside the home. As such, it was reasonable for the officers to enter the home in order to secure the scene and the safety of any individuals inside. As the trial court noted, under the circumstances "it would have been a dereliction of duty for the officer not to investigate the residence since the door was ajar." We also note that it was reasonable for the officers to temporarily detain the occupants and "freeze" the scene while a search warrant was obtained. *See Illinois v. MacArthur,* 531 U.S. 326, 331-32, 121 S. Ct. 946, 949-50, 148 L. Ed. 2d 838 (2001).

As a sub-issue, Defendant argues that the officers did not have probable cause to stop the two male suspects or to take either of the suspects into custody. Defendant argues that without probable cause, the seizure of the two suspects was illegal. Consequently, Defendant asserts that suspect Pigg's statement that he was "visiting his cousin" was illegally obtained, and therefore the officer's presence on the premises to verify the statement was also illegal. Defendant argues that the officers "entered the premises under a subterfuge" and only upon entry discovered the reasonable grounds for apprehending the suspects. Defendant contends that because the police were on the premises illegally, the initial warrantless entry into the home was illegal, thereby rendering the warrant invalid as well as any evidence obtained therefrom.

Because "the Fourth Amendment protects people, not places," *Katz v. United States,* 389 U.S. 347, 351, 88 S. Ct. 507, 511, 19 L. Ed. 2d 576 (1967), a defendant has standing to challenge the admission of evidence only if the defendant's own constitutional rights have been violated. *See United States v. Salvucci,* 448 U.S. 83, 86-87, 100 S. Ct. 2547, 2550-51, 65 L. Ed.2d 619 (1980). In cases involving Fourth Amendment violations, we determine standing by deciding whether a defendant can establish "a legitimate expectation" of privacy in the area searched or the items seized. *Minnesota v. Carter*, 525 U.S. 83, 91, 119 S. Ct. 469, 474, 142 L. Ed. 2d 373 (1998). Such inquiry involves determining "(1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." *State v. Munn,* 56 S.W.3d 486, 494 (Tenn. 2001) (citing *Smith v. Maryland,* 442 U.S. 735, 740, 99 S. Ct. 2577, 2580, 61 L. Ed. 2d 220 (1979)).

Defendant cannot assert a violation of the Fourth Amendment rights of suspects Pigg and Clark as a result of the seizure because he does not have a reasonable expectation of privacy in the persons of either suspect. Nor can Defendant assert a violation of his rights as a consequence of suspect Pigg being seized on his front porch because an individual "does not have an expectation of privacy 'in the area in front of his residence leading from the public way to the front door.'" *State v. Cothran,* 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003) (quoting *State v. Baker,* 625 S.W.2d 724, 727 (Tenn. Crim. App.1981), *overruled on other grounds, State v. Holt,* 691 S.W.2d 520, 522 (Tenn. 1984)). Therefore, Defendant has no standing to challenge the seizure of either suspect or to argue that the subsequent search of his home was tainted by the illegality of this initial seizure.

## C. Validity of Search Warrant

Defendant does not challenge the validity of the search warrant itself, nor the affidavit submitted in support of the search warrant. He argues only that the search warrant should be quashed because the officers' initial warrantless search of his home violated his Fourth Amendment rights, thus the fruits of the warrantless search are illegal and cannot provide a proper basis for an affidavit in support of a valid search warrant. Having found that probable cause and exigent circumstances existed for the warrantless entry, we conclude that the officers were lawfully in the residence. As such, we find that the search warrant was valid and Defendant is not entitled to relief.

### CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____

THOMAS T. WOODALL, JUDGE