# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 20, 2008 Session

## STATE OF TENNESSEE v. JOSE NOE GUTIERREZ

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-A-807   Mark J. Fishburn, Judge**

_____

**No. M2007-02064-CCA-R9-CO - Filed March 25, 2009**

_____

The defendant, Jose Noe Gutierrez, was indicted for first degree premeditated murder, felony murder, and two counts of attempted aggravated rape. Prior to trial, the defendant filed a motion to suppress a statement he made to police after his arrest, alleging that "his initial detention at his place of employment was made without probable cause in violation of his Fourth Amendment rights and all his statements were therefore fruit of the poisonous tree and should be suppressed." The trial court granted the motion and also granted the State's request for an interlocutory appeal. On appeal, the State argues that the defendant's arrest was supported by probable cause, or, in the alternative, that the defendant's statement was not tainted by the illegal arrest. Upon review of the record and the parties' briefs, we affirm the ruling of the trial court.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES, SP. J., joined. JOHN EVERETT WILLIAMS, J., filed a dissenting opinion.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; and Jennifer Stribbling, Assistant District Attorney General, for the appellant, State of Tennessee.

Jerry Gonzalez, Nashville, Tennessee, for the appellee, Jose Noe Gutierrez.

## OPINION

### I.  Factual Background

At the suppression hearing, Detective Brad Corcoran testified that on the morning of September 27, 2004, he received a report that a body had been found in the Jumbo Washette on Antioch Pike. He reported to the scene and spoke with a witness, Cindy Harrison. Harrison told Detective Corcoran that she had arrived at the washette at 4:45 a.m. She saw a red van in the parking lot, and three Hispanic men were in or near the van. The men were drinking heavily, and one was

leaning out of the van, vomiting. She was afraid to enter the washette and waited until another man arrived to do his laundry. She did not know the name of the other man.

Harrison told Detective Corcoran that at 5:30 a.m., she heard a noise which led her to believe that a person or persons associated with the Hispanic men outside might be vomiting in the bathroom. After the commotion, two Hispanic men exited the bathroom. One of the men was slender, young, 5'5" to 5'7" in height, and his hair was shaved on the sides and longer on the top. The man was wearing black jeans and a black tank top. The other man was shorter and heavier and was wearing a white shirt and a ball cap. Harrison told Detective Corcoran that the two men joined the three men in the parking lot. All five men got into the van, but they abandoned the vehicle shortly thereafter. The men then walked south on Antioch Pike.

Harrison informed Detective Corcoran that after the men left, Lisa Hunt, an employee of the washette, arrived for work. Harrison told Hunt that she might want to check the bathroom as the men who had just left might have vomited inside. Hunt went into the bathroom and found the body of a young woman. Hunt notified police. Detective Corcoran learned that the victim's name was Emma Lee Fuller. The victim was found lying on her back on the floor, which was wet. Her skirt was pulled up, her lower undergarments were missing, and her bra had been "readjusted." Detective Corcoran stated that there were signs of a struggle in the bathroom, and trash had been dumped around the body.

Detective Corcoran testified that he discovered a van abandoned outside the washette. On September 28, 2004, Detective Corcoran obtained a search warrant to search the van. Pursuant to the search, Detective Corcoran learned that a key had been broken off in the ignition of the van, rendering it inoperable. Detective Corcoran testified that the van's registration "goes back to the defendant"; however, he could not specifically recall whether the defendant's name was on the registration or whether the van was registered to someone with the surname "Gutierrez." Detective Corcoran stated that the address listed on the van's registration was 2421 Jones Boulevard in Murfreesboro. The people who lived at the Murfreesboro address were Alfredo and Tess Gutierrez. Detective Corcoran acknowledged that there was a warrant outstanding for the arrest of Alfredo Gutierrez; however, no effort was made to arrest him. Additionally, Detective Corcoran acknowledged that another individual had previously been arrested while driving the van.

Later on the morning of the murder, Detective Corcoran watched surveillance tapes from a bar and a gas station located near the washette. He said that "the gas station's video was new digital and very clear and you could tell who these people were by their likeness." He maintained that when he watched the tapes, especially the digital tape from the gas station, he could see five Hispanic men, including the defendant and his co-defendant, Alejandro Salazar, walking away from the washette.[1]

---

[1] During a lengthy cross-examination of Detective Corcoran regarding the videos, defense counsel requested, "If the detective is relying on the videotapes, then I'd ask that the videotapes be introduced so that the Court can actually look at them to see if you can really identify the individuals." The State did not object, and the

(continued...)

Detective Corcoran testified that on September 28, 2004, Donna Tabor called police and said that she "recognized the van that she seen in the news . . . and said that she knew the van had been across the street from her home for several months, and if she could see the van that she'd be able to identify it." Tabor told Detective Corcoran that she could identify the van "based on some identification markings or a sticker, had some type of sticker that was on the front of it." Later that day, Detective Corcoran took Tabor to the forensic laboratory to see the van, and she made a positive identification of the vehicle. Tabor told Detective Corcoran that approximately twelve Hispanic men lived in the house where the van was usually parked. On direct examination, Detective Corcoran stated that Tabor "was able to give us the name of the [Hispanic] people that lived in the home across the street from her." However, upon questioning by the trial court during recross-examination, Detective Corcoran admitted that Tabor "knew none of the[] names" of the Hispanic men who lived across the street from her and that he had not attempted to interview any of those men. Detective Corcoran said that Tabor informed him that a man named Chen was either the owner or the landlord of the residence in question. Through records checks, police discovered that Chen was also the owner or proprietor of the August Moon restaurant in Hickory Hollow Mall.

On September 29, 2004, Rick Howard contacted police and said that he was the man who was in the washette with Harrison. Howard stated that he saw several Hispanic men in a van outside the washette on the morning of the offense. Howard stated that the men were between 5'3" and 5'9" tall.

Also on September 29, 2004, Detective Corcoran called the August Moon restaurant and spoke with Chen. During the following colloquy, he described the conversation he had with Chen:

> [Defense counsel:] You asked Mr. Chen if he had anybody by the name of Gutierrez working there [at the restaurant], right?
>
> [Detective Corcoran:] As I recall, yes, sir.
>
> [Defense counsel:] And . . . you said that Mr. Chen stated, "they're here now," in the plural, but you only asked him one name?
>
> [Detective Corcoran:] Well, again, and I don't recall exactly what I asked him on the phone, but I asked him if he had any male Hispanics that worked for him and he said he did, and, "They're here, he's here," I mean, we were talking about more than one.
>
> [Defense counsel:] Okay. But you didn't know any other names, right?

[1](...continued)
trial court allowed the videos to be filed as a late exhibit.

[Detective Corcoran:]  No.

Detective Corcoran said that Chen informed him that the employee in question also rented housing from him.

Detective Corcoran went to the mall where Chen's restaurant was located and met with Chen in the food court.  Detective Corcoran asked Chen not to tell the defendant that police were there to arrest him.  In order to get the defendant out of the restaurant, the two men agreed that Chen would have "Mr. Gutierrez" go out the back door for supplies.  During the following colloquy, Detective Corcoran explained how the defendant was taken into custody:

> [Detective Corcoran]: . . . As I recall, Mr. Chen was walking with [the defendant].  As they come through the corridor, there's a couple of large doors as they pass through, I was on the other side of the door on one side of the hall, as I recall, another detective, whether it was Collins or Rivera, I don't recall exactly who was on the other side, and we just kind of hooked him under the arms and continued to go out the door with him.
>
> [Defense Counsel]:  And you didn't ask him his name, did you?
>
> [Detective Corcoran]:  No, sir.
>
> [Defense Counsel]: So, [your] reliance on the identity of this individual was on Mr. Chen picking one of his workers out and sending him out the back door towards you?
>
> [Detective Corcoran]:  Correct.
>
> [Defense Counsel]:  When did you first ask him his name?
>
> [Detective Corcoran]:  Probably when we got to south precinct.

Detective Corcoran stated that the defendant was not informed of the reason for his apprehension.

Detective Corcoran opined that the defendant matched Harrison's description of a young, slender Hispanic man; however, he acknowledged that the defendant was 5'8" and Harrison had described the Hispanic men as 5'5" or shorter.  Detective Corcoran said that after he took the defendant into custody at approximately 1:00 p.m., he handcuffed him and drove him to the south precinct for an interview.  While at the precinct, a photograph of the defendant was taken, reflecting

the defendant's appearance two days after the murder. Detective Corcoran conceded that the defendant's hair was not shaved on the sides as Hardison had described.

Detective Corcoran testified that he was "still investigating" the case when the defendant was taken into custody. However, Detective Corcoran later said:

> In this case, we knew that we had probable cause to attempt to make an arrest, but at the same time, two days had passed before we were able to locate the defendants, and at the time we did not want to have a chance of them being a flight risk or running, they were taken into custody and treated as suspects rather than witnesses because we knew we were past that point of having them as witnesses.

Detective Corcoran stated that the defendant's interview began at approximately 1:45 p.m. and lasted almost an hour. Detective Corcoran learned that the defendant did not speak English; therefore, Detective Corcoran used Detective Rivera as an interpreter. At the beginning of the interview, Detective Corcoran informed the defendant of his <u>Miranda</u> rights. The defendant waived his rights and indicated that he wanted to speak with police. During the interview, the defendant initially denied involvement in the murder. However, upon being told that police had a videotape placing him at the scene, he acknowledged that he and Salazar had picked up the victim, a prostitute, on Murfreesboro Road and had taken her to the washette. They went into the washette's bathroom with the victim. The defendant paid the victim twenty dollars and had vaginal intercourse with her while Salazar waited outside the bathroom. Afterward, the defendant waited outside the bathroom while Salazar went inside to engage in sexual activity with the victim. The defendant told police that shortly thereafter, Salazar came out and complained that the victim would not provide the service he desired. An argument ensued, and Salazar choked the victim with both hands while the defendant held her. The men left her on the bathroom floor. They told the men in the van that they needed to leave because they had kicked the victim.

Detective Corcoran stated that after the interview, he decided to charge the defendant with the homicide. Salazar was also arrested. Thereafter, Detective Corcoran prepared an arrest warrant charging both men with first degree premeditated murder, felony murder, and two counts of attempted aggravated rape.

Subsequently, the defendant filed a motion to suppress, alleging that police did not have probable cause to arrest him at the restaurant or a warrant authorizing the arrest. As support for his argument, the defendant contended that there were numerous people who could have been considered suspects in the murder, noting that Harrison saw five Hispanic males and that there were four vehicles at the scene. He asserted that the witnesses' descriptions were extremely vague, describing only Hispanic males of certain heights, which could have matched a large number of Hispanic males. Additionally, regarding the videotapes, he argued:

We have no videotape showing who came out of the bathroom or who was actually at the laundry mat. Detective Corcoran refers to videotapes, but I think the Court, when it reviews the videotape, will find that you cannot identify the people on the videotape. You just see five young men walking along. You cannot identify who is who and you certainly cannot really make out the hair.

Further, the defendant contended that he did not match the witnesses' descriptions of the men in the washette, especially in height and hairstyle. The defendant also argued that, while the van was registered to the defendant, individuals other than the defendant had connections to the van, namely the residents at the address to which the van was registered and the man who had been arrested while driving the van. Moreover, the defendant observed that the address where Tabor had previously seen the van was a residence which housed at least twelve Hispanic males. The defendant pointed out that the State possessed no physical proof, absent the van's registration and his ethnicity, connecting him to the murder.

In response to the defendant's motion, the State argued that the police had probable cause to support the warrantless arrest of the defendant. The State listed the following facts supporting the finding of probable cause. First, the State said that Harrison and Howard had informed police that three Hispanic men had been in and around a red van which was parked at the washette near the time of the murder. Additionally, Harrison had informed police that after she heard noises coming from the washette bathroom, she saw two Hispanic males emerge from the bathroom and walk to the van. Shortly thereafter, the victim's body was discovered in the bathroom. Police discovered that the abandoned van in the washette parking lot was registered to the defendant. Tabor identified the van and gave the location at which she had previously seen the van. Police discovered from Chen, the defendant's employer and landlord, that the defendant lived at the address where the van was previously seen. The State maintained that video surveillance from businesses near the washette depicted five Hispanic men, one of whom was the defendant, walking away from the direction of the washette near the time Harrison saw the Hispanic men leave the washette. The State also contended that the defendant's appearance was consistent with the descriptions given by Harrison and Howard.

At the conclusion of the hearing, the trial court took the matter under advisement. Thereafter, the trial court issued an order granting the defendant's motion to suppress his confession. The court found that police did not have probable cause to arrest the defendant at the time he was taken into custody at the restaurant. Specifically, the trial court found that the

facts and circumstances are insufficient to lead a prudent person to believe that [the defendant] committed the offense for several reasons. First, and probably the most obvious, is that no one at the point [the defendant] was arrested, had identified him as being in or near the Jumbo Washette at or near the time of the murder. . . . Further, the five (5) male Hispanics captured on security video tapes are seen from such a distance and/or angle that the videos are of little,

if any, benefit to anyone in making an identification of [the defendant].

The court also noted that a photograph taken shortly after the defendant's arrest showed that the defendant's hair did not match the description given by Harrison of the suspect's hair, specifically observing that Harrison had described the suspect's hair as "shaved on the sides of his head," but the defendant's hair was "simply . . . combed straight back and held closely to his head by the use of some type of ointment or tonic." In the order, the court stated, "In truth, the description known to the police of one of the suspects only vaguely resembles [the defendant]. Then again, the description would include a sizable segment of the young, male Hispanic community. It certainly doesn't point at him to the exclusion of many others."

The court found that although the van at the scene was registered to the defendant, there was no proof that the defendant was at the scene, particularly because "other people had access to the vehicle based on the arrest of another individual who was driving it several months before." The court stated:

> It is simply not reasonable to objectively conclude that [the defendant] was at the scene simply because his car was there. And even if such a leap could be objectively argued, that still does not place [the defendant] inside the laundry mat. This is particularly important since there are no facts or circumstances implicating the three (3) Hispanics in the vehicle with the events that unfolded in the restroom.

Additionally, the court said, "The final circumstance known to the police was that the five (5) men [were] walking away in the general direction of where [the defendant] lives. Certainly this is a factor to consider, but it must be borne in mind that eleven (11) other male Hispanics also resided with the [d]efendant."

In sum, the court found that "it takes suppositions and not just reasonable inferences to place [the defendant] in the restroom of the Jumbo Washette. However, mere suspicion or hunches does not probable cause make." The court stated that police had reasonable suspicion to temporarily detain the defendant to ascertain why his van was at the washette at the time of the murder but that reasonable suspicion was not sufficient to support a custodial interrogation, even for investigative purposes. The court further found that the arrest was not sufficiently attenuated so as to not be "fruit of the poisonous tree." Specifically, the court noted that the confession was given shortly after the arrest, there were no intervening circumstances between the arrest and the confession, and the officers "intimidat[ed]" the defendant by threatening the death penalty and failing to advise him of the reason for his arrest. After the trial court filed the order granting the defendant's motion to suppress, the trial court and this court granted the State's request to pursue an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure.

## II. Analysis

On appeal, the State contends that the trial court erred in finding that the defendant's arrest was not supported by probable cause and that the confession was not sufficiently attenuated to be admissible. In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

Both the Fourth Amendment to the United States Constitution and Article 1, section 7 of the Tennessee Constitution prohibit unreasonable searches and seizures by law enforcement officers. However, these constitutional protections do not prohibit all police-citizen encounters. Instead, the constitutional provisions are designed to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001) (quoting State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997)); see also State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997). Therefore, "these constitutional protections are implicated only when a police officer's interaction with a citizen impermissibly intrudes upon the privacy or personal security of the citizen." State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000).

In construing the Fourth Amendment, courts have recognized three types of police-citizen interactions: "(1) a full scale arrest which must be supported by probable cause; (2) a brief investigatory detention which must be supported by reasonable suspicion; and (3) brief police-citizen encounters which require no objective justification." Id. (citing Florida v. Bostick, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386 (1991); Brown v. Illinois, 422 U.S. 590, 602, 95 S. Ct. 2254, 2261 (1975); and Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968)). Generally, "a 'seizure' implicating constitutional concerns occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." Id. at 425. In determining when an encounter becomes a seizure, a court should consider all of the circumstances pertaining to the encounter. Id. Some relevant factors are as follows:

> the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

Id. at 426. Furthermore,

> [i]n Tennessee, an arrest is more specifically defined as the "taking, seizing, or detaining of the person of another, either by touching or

-8-

putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." An arrest may be affected without formal words or a station house booking. However, there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer.

State v. Crutcher, 989 S.W.2d 295, 301-02 (Tenn. 1999) (citations omitted).

Our review of the record reveals that the defendant was effectively "under arrest" at the time he was taken into custody at the restaurant and transported to the south precinct. Detective Corcoran testified that at the time the defendant was taken into custody, police were still investigating the homicide. Detective Corcoran said that the defendant was treated as a suspect, not as a witness, during the interview. Detective Corcoran also said that police possessed probable cause to arrest the defendant when he was taken into custody at the restaurant. Detective Corcoran testified that when the defendant was taken into custody, he was under police control and was not free to leave. "'[D]etention for custodial interrogation – regardless of its label – intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest.'" State v. Johnson, 980 S.W.2d 414, 422 (Tenn. Crim. App. 1998) (quoting Dunaway v. New York, 442 U.S. 200, 216, 99 S. Ct. 2248, 2258 (1979)). In the instant case, we conclude that the defendant was detained for the purpose of custodial interrogation. Id. Accordingly, the arrest needed to be supported by probable cause. See State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997).

The defendant complained at the suppression hearing that he was arrested without a warrant and without probable cause. Tennessee Code Annotated section 40-7-103(a)(3) (2003) provides that an officer may arrest a person without a warrant "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it." See also State v. Robert A. Cummins, No. W2000-00277-CCA-R3-CD, 2001 WL 912792, at *5 (Tenn. Crim. App. at Jackson, Aug. 10, 2001) ("Our courts make little, if any, distinction between the terms 'reasonable cause' and 'probable cause' in determining whether there exists a basis for an arrest."). In the instant case, upon the discovery of the victim in the washette bathroom, police were justified in believing that a homicide had been committed. Unquestionably, homicide, in its varying forms, is a felony. See Tenn. Code Ann. § 39-13-201, *et. seq.* (2003). Thus, our next inquiry is whether police had probable cause to believe that the defendant committed the offense. See State v. Lewis, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000). Our supreme court has explained that "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act," constitutes probable cause. State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998).

Courts should determine the existence of probable cause after assessing all of the information available to the officer at the time of arrest. See State v. Woods, 806 S.W.2d 205, 212 (Tenn. Crim. App. 1990). To this end, Tennessee Rule of Criminal Procedure 4(b) provides that in the application for the issuance of an arrest warrant, "[t]he finding of probable cause shall be based upon evidence, which may be hearsay in whole or in part provided there is a substantial basis for believing the

source of the hearsay to be credible and for believing that there is a factual basis for the information furnished." It has long been established that "[w]hile this rule applies itself particularly to warrants for arrest, the same principle must be considered applicable to establish probable cause where an arrest has been made without a warrant." State v. Raspberry, 640 S.W.2d 227, 228 (Tenn. Crim. App. 1982); see also State v. Tays, 836 S.W.2d 596, 600 (Tenn. Crim. App. 1992).

On appeal, the State argues that police had probable cause to arrest the defendant based upon the presence of the van which was purportedly registered to the defendant and abandoned at the scene, the similarities in the descriptions provided by the witnesses at the scene, and the surveillance videos. The State also argues that even if there were no evidence to place the defendant inside the washette, "a man of reasonable caution" could nevertheless believe that his presence at the scene indicated that he had some culpability in the homicide.

Following the suppression hearing, the trial court found that police did not have probable cause to arrest the defendant at the restaurant. The court specifically found that at the time of arrest, no one had identified the defendant as being in or near the washette at the time of the murder. The court further found that the videotapes were of "such a distance and/or angle that the videos are of little, if any, benefit to anyone in making an identification" of the defendant. The court noted that "the description known to the police of one of the suspects only vaguely resembles" the defendant, as well as a "sizable segment of the young, male Hispanic community." Additionally, the court found that the mere presence of the defendant's van at the scene did not establish the defendant's presence at the scene. The court specifically recognized "for probable cause purposes that conflicting inferences do not have to be resolved and the police are able to rely on any reasonable inferences that may be drawn from the facts." Nevertheless, the court found "that it takes suppositions and not just reasonable inferences to place [the defendant] in the restroom of the Jumbo Washette." The court stated that the information available to police at the time of the defendant's arrest amounted at best to reasonable suspicion, which was insufficient to support an arrest.

Despite the State's assertions to the contrary, we conclude that the evidence does not preponderate against the trial court's findings. Like the trial court, we conclude that police had reasonable suspicion to briefly detain the defendant to determine whether he had any information about the crime. However, given the tenuous nature of the evidence linking the defendant to the crime, we agree with the trial court that the evidence was insufficient to establish probable cause to warrant his arrest.

Thus, we must address whether the defendant's statement is sufficiently attenuated from the illegal arrest to warrant admission at trial. In determining whether evidence, such as a statement given to police after an unlawful arrest, is the fruit of a prior illegality, the "apt question . . . is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417 (1963) (quoting Maguire, Evidence of Guilt 221 (1959); see also State v. Garcia, 123 S.W.3d 335, 346 (Tenn. 2003). To help in our analysis, we may consider the following factors:

(1) the presence or absence of Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct.

State v. Huddleston, 924 S.W.2d 666, 674-75 (Tenn. 1996). The State is required to prove by a preponderance of the evidence that the evidence is admissible. State v. Dean, 76 S.W.3d 352, 362 (Tenn. Crim. App. 2001).

In the instant case, the trial court found that all factors, except for the existence of Miranda warnings, indicated that the defendant's statement should be suppressed. On appeal, the State argues that the defendant's statement was not tainted by the illegal arrest because police advised the defendant of his Miranda rights, "a substantial lapse of time existed between the arrest and the confession, and, although there were few intervening circumstances, the officer's conduct was not designed to coerce a confession."

The record reflects that the defendant was advised of his Miranda rights prior to making the statement. As we noted, the trial court found that this factor weighed in favor of the statement's admissibility. State v. Carter, 16 S.W.3d 762, 767 (Tenn. 2000). However, the court found that the "lapse of less than [one and] one-half (1½) hours [between the illegal arrest and the statement] weighs strongly in favor of suppression." Moreover, the court stated that "[e]xamples of intervening circumstances include[] speaking to an attorney, relatives, friends, or other persons in whom they may put their trust. . . . [T]he only indication that [the defendant] was given an opportunity to speak to anyone was at the time he was read his Miranda rights." The court found that this factor, too, weighed "strongly in favor of suppression." Huddleston, 924 S.W.2d at 675.

In turning to the final factor, the purpose for and flagrancy of the misconduct, the court stated, "The State suggests in its brief that the interview of [the defendant] was a routine procedure during the course of a murder investigation. Hopefully, this is not the case. Regardless of the good intentions that motivated the police action, they cannot be used as a sword to pierce the shield afforded by the Fourth Amendment to private citizens." The trial court stated that

> a telltale sign of [the] true purpose [of the interview] can be found in Detective Corcoran's admission that the case was still in the investigative stage until the interviews were completed. The custodial seizure and questioning in this case, both in design and execution, was investigatory in nature for the purpose of gathering the necessary information to support the issuance of an arrest warrant. Unlawful arrest, detentions and questioning of a suspect or anyone else for purposes of gathering evidence to make an arrest is contrary to the protections afforded by the Fourth Amendment.

The court found that this factor weighed heavily in favor of suppression.

-11-

Our review of the record leads us to the same conclusion as the trial court; the defendant's statement was not sufficiently attenuated from his illegal arrest so as to warrant admissibility. Accordingly, the trial court correctly ruled that the statement should be suppressed.

### III.  Conclusion

In sum, we conclude that the trial court correctly found that the warrantless arrest of the defendant was not supported by probable cause and that the defendant's statement was not sufficiently attenuated from the illegal arrest and therefore was inadmissible.  Therefore, we affirm the ruling of the trial court.

_____
NORMA McGEE OGLE, JUDGE